Filed 4/27/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

BRIAN CUEVAS, a Minor, etc., et al.,

  Plaintiffs and Respondents,

v.

CONTRA COSTA COUNTY,

  Defendant and Appellant.

A143440 & A144041

(Contra Costa County
Super. Ct. No. MSC09-01786)

Plaintiff Brian Cuevas, through his guardian ad litem, brought an action for medical malpractice against defendant the County of Contra Costa, among others, arising out of injuries he sustained at birth. A jury awarded him $9,577,000 as the present cash value of his future medical and rehabilitation care expenses. Defendant appeals from the damages verdict, asserting, among other things, that the trial court erred in excluding evidence that health insurance benefits under the Patient Protection and Affordable Care Act (ACA) (Pub.L. No. 111-148 (Mar. 23, 2010) 124 Stat. 119) would be available to mitigate plaintiff's future medical costs. We agree that the trial court erred in ruling that evidence of future ACA benefits is inadmissible. We reverse the judgment and remand the case for a new trial on the amount of plaintiff's future medical damages. In light of our conclusion, we also reverse the postjudgment orders awarding costs and expert fees.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

*Background*

Because defendant does not contest the jury's findings of liability and proximate cause, we need not address the facts of this case in great detail. Plaintiff suffered

irreversible brain damage in utero while his mother's pregnancy was being managed by Dr. Teresa Madrigal, a physician employed by defendant. Plaintiff is the surviving twin of a monochorionic-diamniotic pregnancy—a condition whereby identical twins share a placenta, but have separate amniotic sacs.

When plaintiff's mother reported for an appointment at 37 weeks and six days pregnant, only one fetal heartbeat could be detected. She was transferred to a hospital by ambulance, where the twins were delivered via caesarian section. Plaintiff's twin had died, and plaintiff had suffered a hypoxic brain injury. As a result, plaintiff has a very low verbal IQ and will never be a functional reader. He also has serious language communication difficulties, significant behavioral problems, and has been diagnosed with cerebral palsy. Though he has severe developmental delay, he is sociable. He is toilet trained and can walk, run, and feed himself. In the future, he will be able to feed, dress, and bathe himself. However, he will be dependent on others for his personal care and safety for the rest of his life.

On April 19, 2010, plaintiff, through his guardian ad litem, filed a first amended complaint (FAC) against Contra Costa County Health Services and 13 other defendant health care providers and medical centers. The FAC alleges two causes of action: (1) medical malpractice as to plaintiff, and (2) negligent infliction of emotional distress as to his mother.[1] Plaintiff's theory at trial was that he sustained his injury because Madrigal breached the applicable standard of care by failing to schedule his delivery prior to 37 weeks' gestation. The case was tried to a jury, which found in plaintiff's favor on liability. Defendant does not contest this finding on appeal.

*Plaintiff's and Defendant's Life Care Plans*

During discovery, plaintiff disclosed a life care plan prepared by Jan Roughan, in which she provided her opinion as to the kind of medical and rehabilitative care he will

---

[1] Plaintiff's mother's claims are not at issue in this appeal.

2

need for the rest of his life, along with the projected costs for each specific care item. Her plan was based on the recommendations of medical specialists who testified on plaintiff's behalf. As to future medical costs, the plan does not account for service discounts associated with Medi-Cal, even though plaintiff is currently receiving Medi-Cal benefits. Nor does it reflect negotiated discounts that would potentially be available under insurance procured through the ACA. Instead, Roughan determined future costs for plaintiff's medical care by referencing a national database that reflects the average charges billed for each type of service.

Defendant's life care planner, Linda Olzack, prepared life care plans based on services recommended by a defense pediatric neurologist. In contrast to Roughan, Olzack's plans reflect three alternate cost scenarios, including one in which plaintiff would continue to be covered by Medi-Cal, one in which he would procure private insurance under the ACA, and one in which he would pay for his expenses out of pocket. With respect to the private pay scenario, Olzack did not rely on amounts billed by healthcare providers in calculating future medical expenses. Instead, she contacted local health care providers and asked them how much individuals without insurance are required to pay. These rates typically are less than what providers would state on a bill.

Olzack's alternative plans reflect the wide variations that presently exist in medical charging practices. Her Medi-Cal life care plan reflects reimbursement rates that appear to be substantially lower than the rates paid by persons without insurance. For example, one category of expenses reflects a more than 60 percent difference between the private pay rate and the Medi-Cal rate. Within her plans, she also took into consideration the free benefits that plaintiff is currently entitled to receive from the regional center and public school system.

Olzack also prepared a report comparing the costs for the services itemized in Roughan's plan with the Medi-Cal payment rate for the same goods and services, revealing that Roughan's costs were substantially higher. For example, the cost for a

3

wide variety of physician visits listed in Roughan's plan were four to six times higher than the corresponding Medi-Cal rates.[2]

*Evidentiary Rulings*

On January 10, 2014, plaintiff filed various motions in limine, including one seeking to exclude evidence of collateral source payments from Medi-Cal and other public sources, and another to exclude evidence of future collateral sources. Plaintiff also filed a motion to exclude evidence, opinion, or argument regarding any possible future medical benefits available through ACA-mandated insurance. In part, plaintiff asserted that Civil Code section 3333.1 (section 3333.1), a statute contained within the Medical Injury Compensation Reform Act (MICRA), does not allow the introduction of evidence regarding future collateral source medical benefits. He contended defendant's expert should be prohibited from offering opinions as to such evidence.

On July 14, 2014, defendant filed further briefing on the issue of future medical benefits. In support of its argument that evidence of prospective ACA benefits should be offered to the jury, it included a declaration prepared by Thomas J. Dawson, an expert on the ACA and regulatory and health care policy, who worked for the United States House of Representatives during the passage of the ACA and was directly involved in negotiating key provisions of the legislation.

After hearing argument, the trial court ruled that defendant could not present as a collateral-source offset any evidence concerning publicly funded benefits available through regional centers and the public school system. Relying on section 3333.1, it also ruled defendant could not introduce any evidence of Medi-Cal benefits, nor could it introduce evidence of ACA insurance benefits. With respect to Medi-Cal, the court ruled that Medi-Cal is not subject to MICRA's exception to the collateral source rule. With

---

[2] Roughan also estimated the cost of a surgical procedure to correct plaintiff's strabismus (crossed eyes) at $14,785. Olzack's report stated that the Medi-Cal reimbursement rate for this procedure would be only $4,527.

4

respect to the ACA, the court also reasoned: "I believe that there is no reasonable certainty that that benefit will be in place, and that's something that—you have to cross that barrier in order to be considered as something that should be presented to the jury for factual consideration."

On August 28, 2014, defendant filed a request for clarification regarding the presentation of evidence as to plaintiff's future medical expenses. Specifically, it asserted Roughan had relied on "inflated" billed amounts in calculating the cost of plaintiff's future medical care, rather than the lower amounts providers actually accept as full payment. Defendant questioned whether the trial court had intended to allow the introduction of such evidence when it made its earlier rulings on plaintiff's motions in limine. Defendant suggested the evidence should instead be limited to the amounts health care providers will accept in the future as full payment.

Defendant noted Roughan's life care plan did not reflect the substantially lower amounts that would be accepted as full payment under Medi-Cal or private insurance.[3] It relied heavily on *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*) and *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*) in arguing that plaintiff's recovery should be limited to the amount he proves is likely to be paid to providers for his future medical care, not the amount his providers are likely to bill. It contended that the billed rates reflected in Roughan's plan were therefore inadmissible.

Defendant also asked whether it would be allowed to introduce evidence concerning the range of amounts healthcare providers accept as full payment, without making reference to the actual sources (i.e., Medi-Cal or private insurance) of those payments. Defendant asserted that introducing these reduced amounts "would assist the

_____

[3] The parties stipulated that plaintiff's medical expenses up to the time of trial totaled $55,780.

5

jury in evaluating the reasonable value of plaintiff's future medical care, without violating the collateral source rule by disclosing the third party source of payment."  It reasoned "[t]he fact that Medi-Cal does not fall within the exception to the collateral source rule of MICRA is completely separate from the issue of whether the County may introduce evidence regarding the amounts Medi-Cal will pay for a service, without referencing the source of payment.  In the former scenario, the County would be seeking to be completely relieved from paying for a service that Medi-Cal will cover, while in the latter, the County simply seeks to provide the jury with all of the information needed to determine the reasonable value of plaintiff's future medical care."

The trial court stated that it would allow evidence of Roughan's reliance on the national database to project plaintiff's medical costs into the future "because it's not relying on past billed amounts."  The court also indicated it would permit Olzack to testify that she had based her own calculations on the lower amounts that are accepted by healthcare providers under certain circumstances (the private pay scenario).  However, defendant would not be allowed to attempt to establish that future billed amounts do not reflect the amounts that will actually be accepted by the providers.

Defendant also sought a modified version of CACI No. 3903A (with the modification italicized):  "To recover damages for future medical expenses, plaintiff Brian Cuevas must prove the reasonable cost of reasonably necessary medical care that he is reasonably certain to need in the future. *The damages awarded for future medical expenses cannot exceed the amount that is reasonably certain to be owed or paid to plaintiff's healthcare providers in the future for that care.*"  The trial court rejected defendant's proposed modification.

### Evidence Offered at Trial

Roughan's life care plan was admitted in evidence during her testimony. Subsequently, Olzack was permitted to testify about her private-pay life care plan, the only version of her three plans that the trial court allowed into evidence.  Olzack noted

6

that her plan identifies the providers her office contacted to obtain her cost estimates. As to the specific services listed for future medical care, her task was not to make care recommendations, but only to determine how much the recommended services will cost. Unlike Roughan, Olzack did not rely on the charged amounts that appear in national health care cost databases. Notwithstanding their different approaches, Olzack's private-pay plan reflects essentially the same costs as Roughan's plan for many life care categories.

Based on a projected remaining life expectancy of 74 years, plaintiff's economist calculated the total value of his future care expenses under Roughan's life care plan to be $285 million, with a present value of nearly $29 million. In contrast, defendant's economist took the rates to which Olzack was permitted to testify and concluded that the present value of plaintiff's future service needs totaled somewhere between $3,233,670 and $3,340,222. Defendant claims these estimates would have been significantly lower if Olzack had been able to factor into her analysis the free benefits plaintiff receives from the regional center and the school system, as well as discounted medical care rates that would apply under Medi-Cal or a private insurance policy.

### Jury Instructions and Verdict

The jury found in favor of plaintiff and awarded $100 million for future medical, hospital, surgical, and rehabilitation care expenses, which it reduced to $9,577,000 in present cash value. The total represents approximately one-third of what plaintiff had sought, and about three times the total in the private pay version of Olzack's plan that the trial court admitted into evidence. Following posttrial motions, defendant appealed from the judgment and postjudgment orders awarding plaintiff costs and expert witness fees.

7

## DISCUSSION

### I.    *Issues and Standard of Review*

On appeal, defendant asserts the trial court committed four categories of error, all pertaining to its rulings regarding evidence of the costs for plaintiff's future care.[4] Defendant claims the court erred in (1) barring evidence under section 3333.1 of future benefits that will be available to plaintiff through the ACA; (2) ruling that his future medical expenses could be based upon figures derived from billed rates; (3) relying on the collateral source rule to exclude evidence concerning insurance benefits available under the ACA; and (4) relying on the collateral source rule to exclude evidence of free regional center and educational benefits.

Trial courts ordinarily enjoy broad discretion with respect to the admission and exclusion of evidence in ruling on motions in limine. (*Katiuzhinsky v. Perry* (2007) 152 Cal.App.4th 1288, 1294.) Nonetheless, that discretion "is limited by the legal principles applicable to the case." (*Ibid*.) Where a trial court's exclusion or admission of evidence " ' " 'transgresses the confines of the applicable principles of law,' " ' " it is an abuse of discretion. (*Ibid.*) Thus, to determine whether the trial court abused its discretion here, we must first determine what the law permits and requires with respect to the recovery of future medical damages under MICRA.

---

[4] Plaintiff asserts defendant cannot show prejudice because it did not ask the jury to segregate the elements of his future medical damages. By constitutional mandate, we cannot reverse a judgment based on instructional error, evidentiary error, or procedural error unless, based on "an examination of the entire cause, including the evidence," we are "of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Under this standard, a trial court's errors require reversal if it is reasonably probable that they affected the verdict. (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) "We have made clear that a 'probability' in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility*." (*Ibid*.) We conclude defendant's claims raise more than an "abstract possibility" as to the effects of the alleged errors on the damages awarded, and elect to address its arguments on their merits.

## II. *The Collateral Source Rule and Section 3333.1*

The collateral source rule provides that " 'if an injured party received some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor.' [Citation.] Therefore, the collateral source rule precludes a defendant from presenting evidence that an injured plaintiff's medical expenses have been paid by an independent source. [Citation.] While the rule may effectively allow a plaintiff to receive a double recovery, ' "[t]he collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. . . . To permit the defendant to tell the jury that the plaintiff has been recompensed by a collateral source for his medical costs might irretrievably upset the complex, delicate, and somewhat indefinable calculations which result in the normal jury verdict. . . ." ' " (*Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 504–505 (*Hernandez*).)

In response to a medical malpractice insurance crisis in California, the Legislature in 1975 adopted MICRA. (*Barme v. Wood* (1984) 37 Cal.3d 174, 178–179 (*Barme*).) Section 3333.1 alters the collateral source rule in medical malpractice cases. A medical malpractice defendant may introduce evidence of "any amount payable as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services." (§ 3333.1, subd. (a), fn. omitted.) If the medical malpractice defendant introduces evidence of the plaintiff's collateral source benefits, the plaintiff may introduce evidence of any payments made to obtain these benefits. (*Ibid*.) This section also provides that "[n]o source of collateral benefits introduced pursuant to

subdivision (a) shall recover any amount against the plaintiff nor shall it be subrogated to the rights of the plaintiff against a defendant." (§ 3333.1, subd. (b).) Under section 3333.1, the jury is informed of collateral source benefits and *may* elect not to award damages that duplicate those benefits. (*Barme,* at p. 179, fn. 5.)

Courts have held that section 3333.1 does not apply to payments made on behalf of an injured party by Medi-Cal (Welf. & Inst. Code, § 14000 et seq.).[5] (*Hernandez, supra,* 78 Cal.App.4th at p. 506.) In *Brown v. Stewart* (1982) 129 Cal.App.3d 331, 341 (*Brown*), the appellate court concluded that applying section 3333.1 to Medicaid payments for medical services would create a direct conflict with provisions of federal law that require states to seek reimbursement of Medicaid payments from third party tortfeasors. Therefore, the collateral source rule continues to apply in medical malpractice cases as to Medi-Cal payments.

## III.   *Evidence Regarding Future Benefits Is Admissible Under Section 3333.1*

### A.  *Section 3333.1 Is Ambiguous with Respect to Awards of Future Damages*

The trial court ruled that section 3333.1 does not allow the introduction of evidence regarding *future* health insurance benefits—only *past* benefits. Defendant asserts that section 3333.1 allows the introduction of future as well as past collateral source medical benefits, thereby allowing the jury to decide whether to reduce a plaintiff's damages award for future medical expenses.

The issue is one of statutory interpretation. A court's "primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] [The court] consider[s] first the words of a statute, as the most reliable indicator of legislative intent. [Citation.] ' " 'Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent

---

[5] "Medi-Cal is California's implementation of the federal Medicaid program." (*Howell*, *supra*, 52 Cal.4th at p. 553, fn. 3.)

10

possible.' " ' " (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.) If, however, " 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' " (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.)

Again, section 3333.1 provides, in relevant part: "In the event the defendant so elects . . ., he may introduce evidence of *any amount payable* as a benefit to the plaintiff as a result of the personal injury pursuant to the United States Social Security Act, any state or federal income disability or worker's compensation act, any health, sickness or income-disability insurance, accident insurance that provides health benefits or income-disability coverage, and any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the cost of medical, hospital, dental, or other health care services. Where the defendant elects to introduce such evidence, the plaintiff may introduce evidence of any amount which *the plaintiff has paid* or contributed to secure his right to any insurance benefits concerning which the defendant has introduced evidence." (§ 3333.1, subd. (a), italics added, fn. omitted.) Defendant argues that the statute's use of the term "amount payable," instead of "amount paid," "contemplates that evidence of future benefits should be admissible as well."[6] We agree.

While the meaning of "paid" as used in subdivision (a) of this section is clear, in that it references that amount which a plaintiff has already paid to obtain insurance benefits, we agree with defendant that "amount payable" is ambiguous insofar as it could apply to amounts that will be payable in the future as well as to amounts that were

---

[6] Amici curiae the California Medical Association, California Dental Association, and California Hospital Association, on behalf of defendant, assert that the plain language of section 3333.1, subdivision (a), "applies to economic damages 'payable' in the future."

11

payable in the past.[7]  An argument can be made that "amount payable" should be restricted to past medical expenses because the statute only includes an offset for those premiums that a plaintiff has already "paid or contributed."  However, section 3333.1 does not explicitly limit the presentation of a defendant's evidence to past benefits.

Preliminarily, we observe we are not alone in entertaining the notion that section 3333.1 permits the introduction of evidence of future collateral source benefits that a plaintiff is likely to receive.  A footnote in *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 165 (*Fein*) supports the conclusion that available medical insurance can be used by the jury to reduce a medical malpractice plaintiff's *future* medical damages award.[8]  (*Fein*, at p.165, fn. 21.)  In *Fein,* the trial court used an anomalous procedure in implementing section 3333.1.  It did not permit evidence of collateral source benefits to be introduced into evidence.  Rather, because the amount of such benefits was not in dispute, the court ruled that it would simply reduce the verdict by the amount of the benefits.  Neither party objected.  (*Fein,* at pp. 146, fn. 2, 165, fn. 21.)  Thereafter, the jury awarded, inter alia, $63,000 in future medical expenses, and the trial court ordered the defendant to pay the first $63,000 of those expenses "not covered by medical insurance provided by plaintiff's employer, as such expenses were incurred."  (*Id.* at pp. 145–146.)

Although this reimbursement procedure was not raised as an issue on appeal, the Supreme Court observed in the footnote referenced above that the plaintiff did "raise a

_____

[7] Merriam-Webster's online dictionary defines "payable" as "that may, can, or must be paid."  (http://www.merriam-webster.com/dictionary/payable, as of Apr. 27, 2017.)

[8] Plaintiff's cites to two passages from *Howell, supra,* 52 Cal.4th 541 asserting that the court's "consistent use of the past tense in describing the operation of [section 3333.1] leaves little doubt about the court's view that the section does not apply to future benefits."  The assertion is not persuasive as the court was clearly not intending to address the proposition that plaintiff advances.

12

minor contention . . . which is somewhat related to this matter." (*Fein, supra,* 38 Cal.3d at p. 165, fn. 21.)  The court explained:  "In awarding damages applicable to plaintiff's future medical expenses, the trial court indicated that defendant was to pay the first $63,000 of such expenses *that were not covered by employer-provided medical insurance.*  Plaintiff, pointing out that he may not be covered by medical insurance in the future, apparently objects to any reduction of future damages on the basis of potential future collateral source benefits.  Under the terms of the trial court's judgment, however, defendant's liability for such damages will be postponed only if plaintiff does in fact receive such collateral benefits; thus, it is difficult to see how plaintiff has any cause to complain about this aspect of the award.  Indeed, if anything, the trial court *may have given plaintiff more than he was entitled to,* since it did not reduce the jury's $63,000 award by the collateral source benefits plaintiff was likely to receive, but instead imposed a continuing liability on defendant to pay up to a total of $63,000 for any noncovered medical expenses that plaintiff may incur in the future as a result of the injury. Defendant has not objected to this portion of the judgment." (*Ibid.,* first italics in orig., second italics added.)

Concededly, the relevant language in *Fein* appears to be dicta; however, in support of its argument, defendant also draws our attention to several federal court cases holding that section 3333.1 allows the admission of evidence of future insurance benefits.  In *Brewington v. United States* (C.D.Cal. July 24, 2015, No. CV 13-07672-DMG (CWx)) 2015 U.S. Dist. LEXIS 97720 (*Brewington*), the district court concluded section 3333.1 applies to future benefits, and held that evidence concerning future benefits could be introduced at trial.  (*Id*. at pp. *16–*17.)  However, that decision noted the Ninth Circuit had not yet explicitly held that section 3333.1 applies to actions under the Federal Tort Claims Act (28 U.S.C. § 2671 et seq.).  (*Brewington*, at p. *17.)  Nevertheless, it relied on unpublished California authority and a district court case, *Silong v. United States* (E.D.Cal. Sept. 5, 2007) 2007 U.S. Dist. LEXIS 68724, at pp. *13–*18 (*Silong*), in

13

finding it "appropriate to take insurance benefits available under the ACA into consideration in calculating reasonable future life care plan needs." (*Brewington*, at p. *17.)[9] Because we conclude the term "amount payable" is ambiguous, we turn to extrinsic interpretation aids.

### B. Purpose of MICRA and Public Policy

We recently had occasion to reflect on the significant reform created by MICRA legislation. " 'In May 1975, the Governor—citing serious problems that had arisen throughout the state as a result of a rapid increase in medical malpractice insurance premiums—convened the Legislature in extraordinary session to consider measures aimed at remedying the situation. In response, the Legislature enacted . . . MICRA . . ., a lengthy statute which attacked the problem on several fronts.' [Citation.] 'In broad outline, the act . . . sought to curtail unwarranted insurance premium increases by authorizing alternative insurance coverage programs and by establishing new procedures to review substantial rate increases, and . . . attempted to reduce the cost and increase the efficiency of medical malpractice litigation by revising a number of legal rules applicable to such litigation.' " (*Chan v. Curran* (2015) 237 Cal.App.4th 601, 607, fn. omitted; see *American Bank & Trust Co. v. Community Hospital* (1984) 36 Cal.3d 359, 363–364.)

Defendant asserts that as a matter of practice and policy, maintaining a distinction between past and future insurance benefits "makes no sense" because of the public's strong interest in containing medical malpractice liability. We note "[t]he cases agree that MICRA provisions should be construed liberally in order to promote the legislative interest in negotiated resolution of medical malpractice disputes and to reduce

---

[9] Another federal case cited to by defendant in its reply brief assumed, without deciding, that section 3333.1 applies to future collateral source benefits. (*S.H. v. United States* (E.D.Cal. Oct. 29, 2014, Civ. No 2:11-cv-01963-MCE-DAD) 2014 Dist. LEXIS 154222.) The court noted, however, that the issue "does not appear to have a clear answer." (*Id*. at p. *9.)

14

malpractice insurance premiums." (*Preferred Risk Mutual Ins. Co. v. Reiswig* (1999) 21 Cal.4th 208, 215.)

As the Supreme Court stated in *Fein*: "Because section 3333.1, subdivision (a) is likely to lead to lower malpractice awards, there can be no question but that this provision . . . directly relates to MICRA's objective of reducing the costs incurred by malpractice defendants and their insurers. And, as we have seen, the Legislature could reasonably have determined that the reduction of such costs would serve the public interest by preserving the availability of medical care throughout the state and by helping to assure that patients who were injured by medical malpractice in the future would have a source of medical liability insurance to cover their losses." (*Fein, supra,* 38 Cal.3d at p. 166.) Interpreting the statute as abrogating the collateral source rule with respect to future medical benefits as well as past benefits is consistent with the legislative purpose of reducing malpractice insurance costs.

### C. Legislative History

The legislative history of section 3333.1 also supports our conclusion, as it suggests the Legislature intended to allow evidence of benefits payable both in the past and in the future.[10]

Assembly Bill No. 1 (1975-1976 2d Ex. Sess.) (Assem. Bill 1) was enacted and codified as section 3333.1. All of Assem. Bill 1's predecessor bills, including Assembly Bill Nos. 21 (1975-1976 2d Ex. Sess., as introduced May 28, 1975 (Assem. Bill 21), § 2) and 27 (1975-1976 2d Ex. Sess.) as introduced June 2, 1975 (Assem. Bill 27), § 2), identified the Legislature's desire to eliminate duplicative damages, including duplicative future damages, "for the cost of medical care in actions for personal injuries against health care providers or health care institutions when such care has already been *or will*

---

[10] We grant defendant's request for judicial notice of the legislative history of section 3333.1.

*be* provided by a collateral source." (Sen. Bill No. 697 (1975-1976 Reg. Sess.) as amended May 13, 1975 (Sen. Bill 697), § 3, subd. (d), italics added; accord Assem. Bill 21; Assem. Bill No. 22 (1975-1976 2d Ex. Sess.) as amended Aug. 4, 1975 (Assem. Bill 22), § 3, subd. (c); Assem. Bill 27; Assem. Bill No. 1997 (1975-1976 Reg. Sess.) as introduced Apr. 21, 1975, § 2; see also Assem. Bill No. 1943 (1975-1976 Reg. Sess.) as introduced Apr. 17, 1975, § 2, containing substantially similar language.)

While "[p]rior unpassed bills generally have little value in showing legislative intent" (*Medical Board v. Superior Court* (2003) 111 Cal.App.4th 163, 181), here the predecessor bills are instructive. This is because the Assembly Committee on Judiciary acknowledged the relationship between Assem. Bill 1 and its predecessor bills, stating that Assem. Bill 1 "incorporates the concepts or language of the following assembly bills introduced during the regular or special session," referencing Assem. Bills 21 and 27. Since the adopted bill, Assem. Bill 1, incorporated "the concepts or language" of the prior bills, it is not unreasonable to conclude the legislative intent to extend the statute's reach to future damages was adopted as well.[11]

And while the Legislature used the past tense in section 3333.1, subdivision (a) with respect to a plaintiff's right to offer evidence regarding the amount he or she "has paid or contributed" to secure a collateral source benefit, prior versions of the bills, including those that expressly provided that a defendant could introduce evidence of future care that "will be provided by a collateral source," contained this same language concerning the amount a plaintiff "has . . . paid or contributed." (Sen. Bill 697; Assem. Bill 22.) This suggests the Legislature did not understand the use of "paid or contributed" to restrict the term "amount payable" to past collateral source benefits only. Further, our interpretation is consistent with the cardinal principle of statutory

---

[11] We disagree with plaintiff's contention that the Legislature's statements of intent should be ignored because they were omitted from Assem. Bill 1.

construction that " 'we are required to give it an interpretation based upon the legislative intent with which it was passed.' " (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 256.) In sum, we conclude section 3333.1 permits the introduction of evidence regarding future as well as past medical benefits. The trial court thus erred in relying on this section to bar defendant from introducing evidence of future benefits.[12]

### D. The Collateral Source Rule and Howell

Defendant asserts the trial court erred independent of section 3333.1 by relying on the collateral source rule to exclude evidence of the ACA and the amounts that healthcare providers typically accept as payment for their services. Defendant relies on *Howell, supra,* 52 Cal.4th 541 for the proposition that negotiated payment amounts and "the ACA's guaranteed issue and renewal requirements are highly probative because they . . . are 'of substantial probative value' in determining the reasonable value of plaintiff's medical services."[13] Defendant's reasoning is persuasive.

*Howell* addressed whether a plaintiff could recover from a tortfeasor economic damages for amounts billed by a medical provider in excess of the discounted sum the provider agreed to accept as full payment for *past* medical services pursuant to a preexisting contract with the plaintiff's health insurance carrier. *Howell* ultimately concluded the plaintiff was limited to recovering the amount actually paid on his behalf because the billed amounts did not represent an economic loss the plaintiff incurred. (*Howell*, *supra*, 52 Cal.4th at pp. 548–549.)

The *Howell* court explained it was not abrogating or modifying the collateral source rule, it simply found the rule inapplicable: "The rule . . . has no bearing on

---

[12] In fairness to the trial court, it is notable that section 3333.1 was enacted in 1975 yet it appears no reported California state appellate decision has squarely addressed the statute's application to future medical damages awards.

[13] Defendant also relies on two out-of-state cases that deal with past medical damages, not future medical damages, and are therefore not on point.

amounts that were included in a provider's bill but for which the plaintiff never incurred liability because the provider, by prior agreement, accepted a lesser amount as full payment. Such sums are not damages the plaintiff would otherwise have collected from the defendant. They are neither paid to the providers on the plaintiff's behalf nor paid to the plaintiff in indemnity of his or her expenses. Because they do not represent an economic loss for the plaintiff, they are not recoverable in the first instance." (*Howell, supra,* 52 Cal.4th at pp. 548–549.) *Howell* affirmed the vitality of the evidentiary aspect of the collateral source rule, stating evidence that "payments were made in whole or in part by an insurer remains . . . generally inadmissible." (*Id*. at p. 567.) The court declined to opine as to the relevance or admissibility of the full billed amount with respect to noneconomic damages or future medical expenses. (*Ibid.*)

The appellate court in *Corenbaum* addressed issues left open in *Howell, supra,* 52 Cal.4th at page 567. The court held evidence of the full amount billed for a plaintiff's medical care is not relevant to damages for future medical care or noneconomic damages, concluding that the admission of such evidence was error. (*Corenbaum, supra,* 215 Cal.App.4th at pp. 1319, 1330–1333.) The court reasoned the trial court's erroneous admission of such evidence was prejudicial in that case because the record "clearly demonstrate[d]" that the damages awards were based on the full amount billed and not on the lesser amount the plaintiff's medical providers had accepted as full payment. (*Id.* at p. 1333.) The court reversed and remanded for a new trial limited to the issue of compensatory damages. (*Id.* at pp. 1333–1334.)

A recent case from the Second Appellate District, *Markow v. Rosner* (2016) 3 Cal.App.5th 1027 (*Markow*), cites to *Howell* and *Corenbaum,* explaining: "Our Supreme Court has endorsed a market or exchange value as the proper way to think about the reasonable value of medical services. [Citation.] This applies to the calculation of future medical expenses. [Citation.] For insured plaintiffs, the reasonable market or exchange value of medical services will not be the amount *billed* by a medical provider

18

or hospital, but the 'amount *paid* pursuant to the reduced rate negotiated by the plaintiff's insurance company.' " (*Markow,* at pp. 1050–1051.)

In *Markow,* the plaintiffs' life care planning expert estimated that the amount billed for the injured party's future hospitalizations would be approximately $2 million. She also testified that the amount actually paid is usually 50 to 75 percent of the total amount billed, while noting that with respect to one particular hospitalization, the injured party's cost had been reimbursed at a much lower rate of 12.9 percent. She also testified that "reimbursement rates vary and that there is no one 'across-the-board, set percentage.' " (*Markow*, *supra*, 3 Cal.App.5th at p. 1051.) The jury awarded $1.3 million for the cost of future hospitalizations, which the defendant claimed was excessive because the plaintiffs' expert did not consider amounts actually paid for hospitalization. (*Id.* at p. 1050.) If the jury had applied the 12.9 percent rate, he argued, the award for future hospitalizations would have been reduced to $260,000. (*Id*. at p. 1051.) Citing the expert testimony, the appellate court found substantial evidence supported the jury's award of $1.3 million, which was roughly halfway between the expert's 50 to 75 percent reimbursement figure. (*Ibid*.) These cases support the conclusion that the collateral source rule is not violated when a defendant is allowed to offer evidence of the market value of future medical benefits.

### IV.  The ACA

In a related argument, defendant further faults the trial court for preventing it from introducing evidence of future benefits that will be available to plaintiff under the ACA based on its conclusion that it was speculative to assume the ACA will continue to exist. It is noteworthy that this case was briefed before the 2016 presidential election, the aftermath of which did place the ACA's continued viability into question. However, in spite of recent efforts to abolish or substantially alter the ACA, as of the writing of this opinion the ACA remains essentially intact.

Defendant's expert Dawson's declaration supports the proposition that plaintiff will be able to acquire comprehensive health care insurance going forward. In other words, it provides a defense expert assessment of the availability of insurance benefits compatible with defense health care expert Olzack's analysis of sources to finance plaintiff's future need satisfaction. Dawson opined that the ACA is reasonably certain to continue well into the future and that plaintiff will be able to acquire comprehensive health insurance notwithstanding his disability. Dawson reviewed Roughan's and Olzack's life care plans and compared them both to plaintiff's current Medi-Cal coverage and to insurance available on the Covered California health care exchange. Dawson identified specific California insurance plans that would be available to meet many of his needs. He also explained that plaintiff could use funds held in his special needs trust to purchase private health insurance, in which case private insurance would pay first, and Medi-Cal would have a right to reimbursement from the corpus of the trust only upon his death.

Defendant presented evidence sufficient to support the continued viability of the ACA, as well as its application to plaintiff's circumstances. Accordingly, we conclude the trial court's decision to exclude evidence of future insurance benefits that might be available under the ACA on the basis that the ACA is unlikely to continue was an abuse of discretion.[14]

### V. *Evidence of Regional Center and School District Services*

Defendant asserts the trial court erred in excluding evidence regarding the free services that plaintiff is entitled to receive from the regional center and school district. Defendant acknowledges that the trial court concluded those benefits did not qualify as collateral sources admissible under section 3333.1, but claims the benefits plaintiff

---

[14] We deny plaintiff's motion for judicial notice of President Donald Trump's executive order dated January 20, 2017, in which he announced his policy to seek the prompt repeal of the ACA. The document is not necessary to our decision.

receives are not collateral sources at all, relying on two out-of-state cases. Defendant's contention is not persuasive.

As we discussed above, the collateral source rule "provides that if an injured party received some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." (*Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 729; *Helfend v. Southern California Rapid Transit Dist.* (1970) 2 Cal.3d 1, 6, 13–14.) In enacting section 3333.1, the Legislature did not totally abrogate the collateral source rule. The Legislature was precise in delineating which sources were to be included in this exception to the collateral source rule. Not all payments made by the state or the federal government were included. (See, e.g., *Brown, supra,* 129 Cal.App.3d at p. 341 [Medi-Cal payments not covered by § 3333.1].)

Regional center benefits, like Medi-Cal benefits, are not paid to the disabled directly. They are paid to the providers by the Department of Developmental Services. The services rendered to plaintiff will be paid for by a regional center funded under the comprehensive statutory scheme designed to meet the needs of the developmentally disabled. (Welf. & Inst. Code, § 4500 et seq.; see discussion in *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 388.) Like Medi-Cal payments, regional center benefits do not fall into any category enumerated by section 3333.1. Contrary to defendant's contention, regional centers also have subrogation rights enforceable by a lien on a client's recovery, just as does Medi-Cal. (Welf. & Inst. Code, §§ 4659.10, 4659.11, 4659.15.) Although the care is paid for by the State of California, we conclude the exception under section 3333.1 is not applicable, and the general collateral source rule applies.

As to the availability of the public schools to address plaintiff's needs, defendant was, in fact, allowed to introduce evidence of benefits he would receive at a public school. Defendant presented evidence to support its argument that plaintiff could get

many of his needs met through the public school.  Plaintiff offered contrary evidence. We find no error.  The task of measuring such damages falls to the jury, and its resolution of disputed issues of probability and extent of harm will be affirmed if supported by substantial evidence.  (*J.P. v. Carlsbad Unified School Dist.* (2014) 232 Cal.App.4th 323, 341–342.)

## VI.  Remaining Issues

As noted above, defendant also argues that the trial court erred in allowing the admission of evidence of plaintiff's future medical expenses that was based upon billed rates, and in refusing its related modification to the standard jury instruction on damages for future medical care.  Because we have concluded that defendant is entitled to a new trial on the issue of plaintiff's future medical costs, we offer some guidance to the trial court.

We agree with *Corenbaum* that while an injured plaintiff is entitled to recover the reasonable value of medical services that are reasonably certain to be necessary in the future, evidence of the *full amount billed* for past medical services cannot support an expert opinion on the reasonable value of future medical services.  (*Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1330–1333.)  It does not appear, however, that Roughan used the full amount billed for past medical services in making the calculations for her life care plan.  We observe "the 'requirement of certainty . . . cannot be strictly applied where prospective damages are sought, because probabilities are really the basis for the award.' " (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533.)  At the time of trial, the precise medical costs a plaintiff will incur in the future are not known.  Nor is it known how a plaintiff will necessarily pay for such expenses.  It is unknown, for example, what, if any, insurance a plaintiff will have at any given time or what rate an insurer will have negotiated with any given medical provider for a particular service at the time and location the plaintiff will require the medical care.  The fact finder is entrusted with the tasks of evaluating the probabilities based on the evidence presented and arriving at a

22

reasonable result.  If issues arise during retrial, the court is directed to address them in a matter not inconsistent with this opinion.[15]

As to the requested jury modification, we observe the standard jury instruction (CACI No. 3903A) states, in relevant part:  "To recover damages for future medical expenses, [name of plaintiff] must prove the reasonable cost of reasonably necessary medical care that [he/she] is reasonably certain to need in the future."  The instruction is an accurate statement of the law and is not, on its face, inconsistent with our decision here.

During oral argument both sides agreed that if the case is remanded for a trial on future medical damages, the jury verdict on future lost earnings should be affirmed. Appellant is not disputing this portion of the jury award.  Therefore, we affirm the jury award of future lost earnings in this case.

## DISPOSITION

The judgment is reversed in part.  The matter is remanded for a new trial on the issue of the amount of plaintiff's future medical damages.  Consequently, the postjudgment orders awarding costs and expert fees are also reversed.  The jury award of future lost earnings is affirmed. The parties are to bear their own costs on appeal.

---

[15] We note much of the costs in plaintiff's life care plan concerned future expenses that do not appear to be covered by medical insurance.  Roughan testified that once he emancipated at age 22, plaintiff would need to live in a supportive living environment for the rest of his life due to his very low IQ level.  Rather than a simple residential facility, she opined that he would need to be placed in a home that employs personnel who have experience caring for brain-injured individuals.  Attendant care was priced at the same amount in both parties' life care plans, presumably because it is not covered by Medi-Cal or any ACA-sponsored private insurance.

_____
Dondero, J.

We concur:


_____
Humes, P. J.


_____
Margulies, J.

Trial Court:        Contra Costa County Superior Court

Trial Judge:        Hon. Steven K. Austin

Counsel:

Horvitz & Levy, H. Thomas Watson, Karen M. Bray, Robert H. Wright; Craddick, Candland & Conti, W. David Walker; Mauro Lilling Naparty, Richard J. Montes for Defendant and Appellant

Cole Pedroza, Curtis A. Cole, Matthew S. Levinson for California Medical Association, California Dental Association, and California Hospital Association as Amici Curiae on behalf of Defendant and Appellant

Fred J. Hiestand for Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant

Alston & Bird, David Venderbush, Brian Boone; California Chamber of Commerce, Heather Wallace; U.S. Chamber Litigation Center, Janet Galeria for Chamber of Commerce of the United States as Amicus Curiae on behalf of Defendant and Appellant

Greines, Martin, Stein & Richland, Robert Olson for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendant and Appellant

The Veen Firm, William L. Veen, Elinor Leary; Alan Charles Dell'Ario for Plaintiff and Respondent

A143440/144041  *Cuevas v. Contra Costa County*