Filed 12/19/24 (unmodified opn. attached; second modification)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DAVID YAFFEE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH SKEEN et al.,<br><br>Defendants and Appellants. | C097746, C097988<br><br>(Super. Ct. No. 34-2016-00204039-CU-PA-GDS)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[CHANGE IN JUDGMENT] |

THE COURT:

The order of this court filed on December 17, 2024, modifying the opinion and denying the petition for rehearing is vacated. The opinion filed herein on November 25, 2024, is modified as follows:

In the section entitled, DISPOSITION, beginning on page 43, the paragraph is deleted in its entirety and replaced with the following:

The award for costs and prejudgment interest is vacated. The awards for past and future medical expenses are reversed and the matter remanded for a new trial limited to these issues. The judgment is otherwise affirmed. Each party shall bear their own costs on appeal pursuant to California Rules of Court, rule 8.278(a)(5).

This modification changes the judgment.

The petitions for rehearing are denied.

BY THE COURT:


_____
HULL, Acting P. J.



_____
DUARTE, J.



_____
BOULWARE EURIE, J.

2

Filed 12/17/24 (unmodified opinion attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DAVID YAFFEE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH SKEEN et al.,<br><br>  Defendants and Appellants. | C097746, C097988<br><br>(Super. Ct. No. 34-2016-00204039-CU-PA-GDS)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 25, 2024, be modified as follows:

On page 44, the costs awarded should read as:

Each party to bear their own costs pursuant to California Rules of Court, rule 8.278(a)(5).  Otherwise, the petition is denied without prejudice as to the ability to resolve the scope of retrial in the Superior Court.

1

There is no change in the judgment.

The petitions for rehearing are denied.


BY THE COURT:




_____
HULL, Acting P. J.




_____
DUARTE, J.




_____
BOULWARE EURIE, J.

2

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| DAVID YAFFEE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH SKEEN et al.,<br><br>Defendants and Appellants. | C097746, C097988<br><br>(Super. Ct. No. 34-2016-00204039-CU-PA-GDS) |

APPEAL from a judgment of the Superior Court of Sacramento County, James P. Arguelles, Judge. Reversed in part and affirmed in part.

Locke Lord, Susan A. Kidwell and Rory S. Miller; Martenson, Hasbrouck & Simon and Stephen W. Robertson for Defendants and Appellants.

Demas Law Group, PC, John N. Demas and Brad Adam Schultz; and C. Athena Roussos for Plaintiff and Respondent.

A jury awarded plaintiff, David Yaffee, $3,299,455 in damages for past and future economic earnings and noneconomic loss for injuries he received when his vehicle was

hit from behind in 2015 by a truck driven by defendant Joseph Skeen while Skeen was driving for his employer KLS Transportation, Inc. (KLS). National Liability & Fire Insurance Company (National) appeared on behalf of KLS in the litigation. We hereafter refer to National and Skeen as defendants.

On appeal, defendants challenge, (1) the award for past medical damages; (2) the award for future medical damages; (3) the awards for past and future lost earnings; (4) the award for future noneconomic damages (pain and suffering); and (5) the award for costs and prejudgment interest.

We reverse the awards for past and future medical expenses and vacate the award of costs and prejudgment interest. The judgment is otherwise affirmed.

FACTS AND HISTORY OF THE PROCEEDINGS

The Accident and Preliminary Medical Treatment

On June 16, 2015, plaintiff was sitting in his stopped car when Skeen, driving a truck while employed by KLS, drove into the back of plaintiff's car. Skeen and plaintiff exchanged information, plaintiff's car was towed away and a friend took him home. At the time, plaintiff felt a burning sensation in his back and neck.

That night, plaintiff's burning sensation became worse. The next morning he also felt tingling in his right leg. He went to his job at the Franchise Tax Board (FTB), but throughout the day, plaintiff became increasingly sore, and he made a same-day appointment to see his primary care physician, Dr. Benjamin Leavy at the UC Davis Medical Center (UC Davis). Dr. Leavy gave plaintiff naproxen and a muscle relaxer.

The parties do not dispute that the health maintenance organization (HMO) that insured plaintiff had a contract with UC Davis regarding payment for services.

About a week later, plaintiff consulted Chip Studley, a chiropractor, in a first of approximately six or seven visits they would have before July 10, 2015. Studley advised

2

plaintiff to consult his primary care physician regarding magnetic resonance imaging (MRI).

On June 26, 2015, a UC Davis physician ordered an MRI.

Thereafter, the tingling sensations in plaintiff's leg became worse and his back remained sore.

Emergency Room Visit

On July 7, 2015, plaintiff was leaving work when he felt intense pain in his back and leg. He could not walk and struggled to get to his car. When he got to his car, he could not feel his foot and called his wife, to pick him up. He then went to the emergency room.

Dr. Ian Michael Julie treated plaintiff in the emergency room at UC Davis. Plaintiff complained of back pain and numbness of his right lower extremity below the knee. Plaintiff said his pain was a 9 out of 10.

Dr. Julie believed the decreased sensation to plaintiff's leg could indicate there was nerve involvement with the pain. Dr. Julie conducted an exam and ordered x-rays to rule out possible causes of plaintiff's symptoms that would be "potentially very, very serious issues that would potentially cause death or disability and would require immediate workup." Having ruled those conditions out, Dr. Julie treated plaintiff with a muscle relaxant and an anti-inflammatory medication and plaintiff was discharged. Emergency room staff told plaintiff to follow-up with his primary care physician, continue to use pain and muscle spasm medication, and to return if things became worse. Dr. Julie gave plaintiff a work note to take one day off to recover that said plaintiff should not perform heavy lifting.

Treatment Following the Emergency Room Visit

Dr. Leavy again met with plaintiff on July 8, 2015.  Dr. Leavy prescribed an opioid pain medication, changed the existing MRI order from routine to urgent, and put in an urgent referral to the spine clinic.

Plaintiff met with Colleen Weaver, an orthopedic nurse practitioner at the UC Davis spine center, on July 20, 2015.  Plaintiff's MRI showed an obvious disc herniation at the L5-S1 level of his spine.  Plaintiff and Weaver discussed surgery and other options, and plaintiff opted to first try physical therapy with possible medication and steroid injections.  Plaintiff tried steroids and two physical therapy sessions but then decided to proceed with surgery.

Dr. Yashar Javidan is an orthopedic spine surgeon with UC Davis.

Dr. Javidan performed a microdiscectomy in September 2015.  Just before the procedure, Dr. Javidan concluded the MRI showed plaintiff had a disc herniation that was compressing a nerve root in his spinal canal.  According to Dr. Javidan, the disc herniation looked acute, and "no one walks around with a disc herniation that size without being in agonizing pain and . . . presenting to a[n] ER or doctor."  The disc herniation Dr. Javidan saw was acute, recent, and consistent with being caused by the collision.

Plaintiff took off work from early September 2015 to mid-January 2016 to recover.

After the surgery, plaintiff's back pain subsided, but the numbness and tingling in his leg persisted.

When Plaintiff again met with Dr. Leavy in November 2016, plaintiff reported a frequent "charley horse" in his leg with sharp pain, which was constant and had a burning quality.  It looked painful when plaintiff was walking.  Dr. Leavy diagnosed plaintiff with chronic midline low back pain with right-sided sciatica, which was more likely than not related to the collision.  When Dr. Leavy met with plaintiff in February 2017, plaintiff

4

still reported low back pain and numbness in his right foot.  Dr. Leavy referred plaintiff to pain management.  Plaintiff tried steroid injections without success.

Dr. Samir Sheth in the department of pain medicine at UC Davis met with plaintiff in August 2017.  He determined plaintiff was a good candidate for neurostimulation.  They began with a spinal cord stimulator trial on November 8, 2017, and after plaintiff reported a 90 percent reduction in his pain they implanted a permanent spinal cord stimulator on November 20, 2017.  Plaintiff's nerve pain and numbness improved.

The relief provided by the spinal cord stimulator lasted until August 2019, when plaintiff began to feel more pain.  He started having a burning feeling down his leg.  He and the stimulator manufacturer tried to adjust the stimulator, but his pain increased.  At trial plaintiff described the nerve pains as burning, electric, and "the worst pain ever."

Plaintiff met with Dr. David Copenhaver, a pain management specialist with UC Davis, in September 2019.  Dr. Copenhaver ordered an electromyography nerve conduction study (EMG) and wanted plaintiff to see Dr. Javidan.  Dr. Melissa Lao, a family medicine specialist who is one of plaintiff's treating physicians with UC Davis ordered an MRI.  The EMG showed there was a nerve root injury at the L5 level of plaintiff's spine with some acute S1 considerations.  The MRI showed a reherniation at the L5-S1 level.

Dr. Javidan performed a fusion surgery on the L5-S1 level of plaintiff's spine in October 2019.

Dr. Javidan initially took plaintiff off work from the date of the surgery to early March 2020.  However, when an MRI showed deterioration to plaintiff's spine in the level adjacent to the first fusion surgery, Dr. Javidan performed a second fusion surgery to treat the adjacent level.  He extended plaintiff's time off through August 2020.

Plaintiff returned to work in September 2020.  At first, plaintiff felt a little better, but he continued to suffer bouts of strong electric nerve pain and had difficulty sleeping at night.  The pain impacted his concentration and he had trouble focusing at work.

In October 2020, Dr. Lao prescribed plaintiff a low dose opioid. In January 2021, plaintiff told Dr. Lao one of his medications would cause him to lose his train of thought, making it hard to focus at work. At later visits, plaintiff continued to report suffering severe pain, and Dr. Lao added other medications to his treatment protocol.

An EMG was ordered in 2021. Dr. Copenhaver testified that the issues at the L5 level that had been shown in the 2019 EMG remained and were extended to the L4 level, with acute ongoing concerns at the S1 nerve root. Dr. Javidan testified the 2021 EMG showed abnormal nerve activity, indicating the nerve was damaged.

In May 2021, Dr. Javidan performed a revision surgery to remove scar tissue near the impacted nerve root. The nerve "did not look like a healthy nerve at all." Plaintiff felt better after the surgery, but then "everything slowly started coming back."

Plaintiff stopped working in May 2021, when Dr. Copenhaver determined plaintiff was unable to perform his job duties. He diagnosed plaintiff with "failed spine surgery syndrome." He reported plaintiff had severe pain that affected his mood and cognition and there were times when plaintiff might not be able to think straight.

Dr. Lao also determined plaintiff should be off work when they met in December 2021. Dr. Lao had first placed plaintiff off work for five months, but she later took him off work entirely and put him on disability. Dr. Lao did not feel there was an accommodation that could be made for plaintiff to return to work because of the impact of his condition on his cognitive abilities.

At trial, plaintiff testified he had continuing electric nerve pain that can wake him in the middle of the night and go for up to 8 to 10 hours. He said nothing helps.

<u>Trial Court Proceedings</u>

Plaintiff filed a personal injury complaint against Skeen and KLS. National filed a complaint in intervention as KLS's liability insurance carrier.

The court considered various motions in limine the parties filed prior to trial.

6

In the plaintiff's case in chief, plaintiff, his wife, and a neighbor testified regarding how plaintiff's injuries have impacted his quality of life.

Plaintiff's treating physicians testified about his pretrial medical treatment and condition, and his possible future needs.

Dr. Ronnie Mimran testified as an expert witness, addressing plaintiff's diagnoses, the cause of his injuries, the reasonableness of his pretrial medical care, and plaintiff's anticipated future medical service needs.

Carol Hyland, a certified life care planner and disability management specialist, provided expert testimony regarding the reasonable value of plaintiff's past medical bills. Hyland also provided estimates for the value of the future medical services Dr. Mimran had identified.

Craig Enos, a certified public accountant translated Hyland's estimates into present value amounts. Enos also testified regarding the amount of plaintiff's past and future lost earnings due to his injury.

Defendants presented evidence of complaints plaintiff made about his back pain dating back to 1999. They called an expert witness who reviewed various images and plaintiff's deposition, and opined about the general health of plaintiff's back and plaintiff's likely future care needs.

Defendants called Nancy Michalski as an expert to testify regarding plaintiff's past medical expenses.

The jury awarded plaintiff $3,299,455 in total damages.

The trial court entered a judgment on the verdict on November 7, 2022.

Defendants moved for a new trial, partial judgment notwithstanding the verdict (JNOV), and to tax costs. The trial court denied the motions for new trial and JNOV. The court entered an updated judgment on January 17, 2023, awarding costs and interest totaling $1,645,685.88.

7

Defendant filed a notice of appeal of the original judgment, and second notice of appeal of the revised judgment and all appealable orders. We consolidated the two appeals.

## DISCUSSION

### I

### *Standards of Review*

" 'Whether a plaintiff "is entitled to a particular measure of damages is a question of law subject to de novo review. [Citations.] The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence." ' (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 753 [].)" (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324 (*Bermudez*).)

A trial court's ruling on a motion in limine is generally reviewed for abuse of discretion. (*Condon-Johnson & Associates, Inc. v. Sacramento Municipal Utility Dist.* (2007) 149 Cal.App.4th 1384, 1392.) "However, when the issue is one of law, we exercise de novo review." (*Ibid.*)

### II

### *Damages for Past Medical Expenses*

A plaintiff seeking compensatory damages for the cost of past medical services must establish that the charges for those services were reasonable. (*Moore v. Mercer* (2016) 4 Cal.App.5th 424, 436-437 (*Moore*); *Calhoun v. Hildebrandt* (1964) 230 Cal.App.2d 70, 73.)

Defendants challenge the award for past medical damages in this case on two grounds. First, they argue the trial court erred in determining the proper measure for past medical damages, and, as a result, the trial court made erroneous decisions regarding the

admissibility of evidence. Second, they claim substantial evidence does not support the award even under the measure applied in this case.

We will reverse and remand for a new trial on the amount of past medical damages because the trial court improperly interpreted the scope of the Hospital Lien Act (HLA; § 3045.1, et seq.) in determining the correct measure of past medical damages. This resulted in errors regarding the admissibility and relevance of evidence pertaining to the reasonable value of plaintiff's past medical services. Because of this conclusion, we need not consider defendants' substantial evidence arguments.

### A. Additional Background

#### 1. Motions in Limine

Plaintiff brought a motion in limine to prevent defendants from introducing evidence that plaintiff incurred any amount other than the reasonable and customary charges for his past medical expenses. The trial court granted the motion "in that" it permitted plaintiff to present evidence of the reasonable value of the medical services he received that were subject to a lien UC Davis had perfected under the HLA. The trial court noted defendants had argued the HLA only applies to emergency medical services. Citing the language in Civil Code section 3045.1 that applies the HLA to "emergency and ongoing medical or other services" and *Parnell v. Adventist Health System/West* (2005) 35 Cal.4th 595, 604 (*Parnell*), the court concluded the HLA is intended to capture all hospital services provided because of a third party's negligent or wrongful act. (Undesignated section references are to the Civil Code.)

Defendants brought a motion in limine to preclude plaintiff from presenting evidence that plaintiff incurred anything for past medical services above what he actually paid for medical services. The court denied the motion to the extent it sought to prevent the plaintiff from presenting evidence of the reasonable value of services plaintiff received that were subject to a lien under the HLA, but otherwise granted the motion. In

making this ruling, the court referenced its thinking in ruling on the plaintiff's motion described above.

In another motion in limine, defendants stated that they understood plaintiff was going to argue his hospital bills and certain liens filed by UC Davis fell under the HLA. Defendants argued the HLA was inapplicable to this case, and that purported liens for amounts the hospital had not collected in charges from the insurer at prenegotiated rates were irrelevant to this case. Defendants sought to prevent plaintiff from making any argument or refer during the trial to any bills or liens for "discounted and written-off amounts for U.C. Davis treatments as past medical special damages." The trial court denied this motion saying plaintiff would be allowed to present value of the reasonable value of services subject to the UC Davis lien.

2. Evidence at Trial Regarding Past Medical Costs and Verdict

Prior to Carol Hyland's testimony regarding the reasonable value of plaintiff's past medical bills, the parties discussed the scope of her testimony. Defendants' counsel stated he understood the defense could not ask what was paid or is owed, plaintiff could not bring up the total charged, and the only thing plaintiff could ask Hyland was what she believed the reasonable value of the treatment was. The court confirmed counsel's stated understanding.

Hyland testified about her methods for determining the reasonable and customary value of past medical services. She explained that for the services plaintiff received, she reviewed the American Hospital Directory, which contains information based on hospital reporting. Hospitals report the average charge for any services they have provided more than 10 times in the past year. Using UC Davis data, Hyland determined the total reasonable value of all plaintiff's past medical services at UC Davis was $993,083.21. She also looked at what that total would be using the average charges of two other local

hospitals for "bigger ticket items" like inpatient care and emergency room services, and she concluded the total would have been $716,295.21.

Defense expert Nancy Michalski critiqued Hyland's methodology. Michalski used different methods to arrive at a reasonable value for past medical services totaling $556,972.46 in facility and physician fees. It is unclear what rates hospitals will accept under contracts with insurance providers played in Michalski's analysis, if any.

The jury award plaintiff $993,083 for past medical services.

B. The Proper Measure of the Award of Damages for Past Medical Expenses in this Matter

### 1. General Standards Applicable to Insured Patients

A plaintiff must satisfy a two-step burden to prove the reasonableness of charges for past medical services. (*Moore*, *supra*, 4 Cal.App.5th at pp. 436-437.) "First, plaintiff must prove that she actually incurred the medical expenses and the amount of [the patient's] liability for the expenses caps her potential recovery. . . . Second, plaintiff must prove the reasonable value of the medical services but is entitled to no more than the expenses [the patient] actually incurred." (*Id.* at p. 437.)

In *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*) our Supreme Court considered the proper measure for calculating past medical expenses of a plaintiff with private health insurance and held, "that an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Id.* at p. 566.)

*Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1329 (*Corenbaum*), discusses evidentiary implications of *Howell* and states, "[b]ecause an injured plaintiff can recover as damages for past medical expenses no more than the amount incurred for those past medical services (*Howell*, *supra*, 52 Cal.4th at p. 555), *evidence that the*

11

*reasonable value of such services exceeded the amount paid is irrelevant and inadmissible* on the issue of the amount of damages for past medical service (see *id.* at p. 559). Moreover, for the jury to consider both evidence of the amount accepted by medical providers as full payment and evidence of a potentially greater reasonable value would very likely cause jury confusion and suggest the existence of a collateral source payment, contrary to the evidentiary aspect of the collateral source rule." (*Corenbaum*, *supra*, at p. 1329, italics added.) The collateral source rule precludes deduction of compensation the plaintiff has received from a source independent of the tortfeasor to reduce recoverable damages and evidence of such payments is inadmissible for that purpose. (*Howell*, *supra*, 52 Cal.4th at pp. 548, 552.)

### 2. Impact of the Hospital Lien Act

With the HLA, "the Legislature established one mechanism through which hospitals that provide emergency services can recoup costs from an entity other than a patient's health care service plan." (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2022) 77 Cal.App.5th 971, 985.)

Section 3045.1 states, every person or entity "maintaining a hospital licensed under the laws of this state which furnishes emergency and ongoing medical or other services to any person injured by reason of an accident or negligent or other wrongful act not covered by [workers' compensation] shall, if the person has a claim against another for damages on account of his or her injuries, have a lien upon the damages recovered, or to be recovered, by the person . . . to the extent of the amount of the reasonable and necessary charges of the hospital and any hospital affiliated health facility, as defined in Section 1250 of the Health and Safety Code, in which services are provided for the treatment, care, and maintenance of the person in the hospital or health facility affiliated with the hospital resulting from that accident or negligent or other wrongful act."

When a hospital receives payment from a patient and his health insurer at a reduced negotiated rate under a prior agreement in which the hospital agreed to accept that payment as "payment in full" for its services, the hospital cannot assert a lien under the HLA to "recover the difference between its usual and customary charges and the amount received from the patient and his insurer." (*Parnell*, *supra*, 35 Cal.4th at p. 598.) However if, "hospitals wish to preserve their right to recover the difference between usual and customary charges and the negotiated rate through a lien under the HLA, they are free to contract for this right" when negotiating their contracts with insurers. (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 554.)

Defendants do not dispute that UC Davis's contract with plaintiff's HMO permits UC Davis to collect for higher than negotiated rates to the extent allowed by the HLA. Defendants have also not placed at issue whether UC Davis perfected a lien. Rather, defendants argue the HLA does not permit recovery under a lien for the services UC Davis provided. To resolve this, we consider the scope of the HLA.

### 3. The Scope of the HLA

In their opening brief, defendants argue (1) the trial court's award for past medical expenses must be reversed under *Howell*, *supra*, 52 Cal.4th 541; (2) UC Davis's ability to recover reasonable and necessary charges for past medical services is limited by the HLA; (3) the HLA only allows hospitals to collect when a defendant receives emergency services; and (4) under the facts of this case, plaintiff never received emergency services because he did not receive services immediately following the accident.

In his responsive brief, plaintiff argues he did receive emergency services and that, therefore, the proper measure of damages for all his past medical services is the reasonable and necessary charges for the services.

We sought supplemental briefing from the parties regarding the meaning of the phrases "emergency services" and "ongoing medical or other services," and the nexus between the two. Defendants continued to argue that plaintiff never received emergency services because he did not receive services immediately after the accident. Plaintiff continued to argue that the care he received from his physician the day after the accident and in the emergency room on July 7, 2015, qualify as emergency services.

Both parties suggest the term "ongoing or other medical services" is broad and, if a hospital provides emergency services, under the HLA, the hospital and its affiliates can collect the reasonable and customary amounts for all the later services it provides related to the injuries sustained in an accident. Both parties have misinterpreted the scope of the HLA.

### a. Principles of Statutory Construction

"We review questions of statutory construction de novo." (*John v. Superior Court* (2016) 63 Cal.4th 91, 95.) " ' "Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose." ' [Citations.] ' " 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' " ' " (*Center for Biological Diversity v. Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 231-232.)

14

"Statutory language susceptible to more than one reasonable interpretation is regarded as ambiguous . . . . Whether statutory language is ambiguous is a question of law subject to an independent determination on appeal." (*Merced Irrigation Dist. v. Superior Court* (2017) 7 Cal.App.5th 916, 925.) "When statutory language is susceptible to more than one reasonable interpretation, courts must (1) select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute and (2) avoid an interpretation that would lead to absurd consequences." (*Ibid.*)

b. <u>Applicable Legislative History</u>

As enacted in 1961, section 3045.1 provided that, every hospital "which furnishes emergency medical or other services of a reasonable value in excess of one hundred dollars ($100) to any person injured by reason of an accident or wrongful act not covered by [workers' compensation], shall, if the person asserts or maintains a claim against another for damages on account of his injuries, have a lien upon the damages in excess of one hundred dollars ($100) recovered, or to be recovered, by the person . . . to the extent of the amount of the reasonable and necessary charges of the hospital for the treatment, care, and maintenance of the person in the hospital during the emergency period. For the purposes of this section, the emergency period shall not exceed a period of 72 hours." (Stats. 1961, ch. 2080, § 1 at p. 4340; § 3045.1 (1991).)

In 1992, with Assembly Bill No. 2733 (Reg. Sess. 1991-1992) (Assembly Bill 2733), the Legislature amended section 3045.1 to its current form. Notably, with the 1992 amendments, the Legislature broadened the scope of services for which a hospital could assert a lien to include "emergency *and ongoing* medical or other services," and removed the requirement that the services be provided during an "emergency period" defined as 72 hours. (See Stats. 1992, ch. 302, § 1 at p. 1223, italics added.) The Legislature also added language that allows hospitals to collect for services provided by

15

not just the hospital, but also by "any hospital affiliated health facility, as defined in Section 1250 of the Health and Safety Code."  (*Ibid.*)

Legislative history documents from 1992 note the underlying problem Assembly Bill 2733 sought to address was that "[m]any hospitals have problems keeping their emergency rooms open because a large proportion of accident victims" they treat "are uninsured."  (See, e.g, Assem. Com. on Judiciary, Analysis of Assem. Bill 2733 as amended May 6, 1992, p. 2; Sen. Ins., Claims & Corps. Com., Analysis of Assem. Bill 2733 as amended Jul. 1, 1992, p. 2.)  Those documents also state, "[u]nder current law, a hospital may only recover compensation for emergency cases, and compensation for those cases is limited to the first 72 hours. . . .  [S]eriously injured persons *are in the hospital* for longer than 72 hours and often require routine care after the initial emergency care is given."  (See, e.g, Assem. Com. on Judiciary, Analysis of Assem. Bill 2733 as amended May 6, 1992, p. 2; Sen. Ins., Claims & Corps. Com., Analysis of Assem. Bill 2733 as amended Jul. 1, 1992, p. 2, italics added.)

Bill analyses state the amended law would allow "hospitals to establish a lien for providing non-emergency medical care to persons injured by accidents or negligent or other wrongful acts."  (See, e.g, Assem. Com. on Judiciary, Analysis of Assem. Bill 2733 as amended May 6, 1992, p. 2; Sen. Ins., Claims & Corps. Com., Analysis of Assem. Bill 2733 as amended Jul. 1, 1992, p. 1.)  They state the amended law would "[a]llow hospitals to recover payment for care that extends beyond 72 hours by deleting the emergency period requirement."  (See, e.g, Assem. Com. on Judiciary, Analysis of Assem. Bill 2733 as amended May 6, 1992, p. 2; Sen. Ins., Claims & Corps. Com., Analysis of Assem. Bill 2733 as amended Jul. 1, 1992, p. 2.)

c.  Emergency Services Must be Provided for the HLA to Apply

First, we address defendants' argument that the trial court incorrectly interpreted section 3045.1 to cover all hospital services provided to a patient injured by a third

16

party's negligence or wrongful conduct, regardless of whether a patient receives initial emergency services. We agree with defendants that the plain language of section 3045.1 requires a hospital to provide emergency services before the hospital can assert a lien under the HLA, and to the extent the trial court found otherwise, it erred.

The statute plainly refers to, "emergency *and* ongoing medical or other services." (§ 3045.1, italics added.) "The ordinary and usual usage of 'and' is as a conjunctive, meaning ' "an additional thing," ' 'also' or 'plus.' " (*In re C.H.* (2011) 53 Cal.4th 94, 101.) Sometimes courts will give "and" a disjunctive meaning—that is, interpret it to mean "or"—"when necessary to accomplish the evident intent of the statute, but doing so is an exceptional rule of construction." (*Id.* at pp. 102-103.)

Neither the plain language of the whole statute nor the Legislative history suggests the Legislature intended to allow for a lien when *no* emergency services are provided.

When considering the plain meaning of a statute, "[p]rinciples of statutory construction require that we avoid interpretations that would render some words surplusage." (*Sustainability, Parks, Recycling & Wildlife Defense Fund v. Department of Resources Recycling & Recovery* (2019) 34 Cal.App.5th 676, 701.) If we were to read the statute to allow for HLA liens on patients that never receive emergency services, we would render the use of the words "emergency *and*" surplusage. If a hospital could assert an HLA lien even if it never provides a victim emergency services, the statute could simply say it applies to "medical or other services," because that language would capture emergency services. Here the use of the words "emergency . . . services" limits the scope of the HLA.

The Legislative history documents also reflect that in amending section 3045.1, the Legislature intended to address costs incurred by hospitals due to treating patients admitted to the hospital through the emergency room. While the documents may reference collecting for nonemergency services, they also reflect that the central problem to be addressed is the ability of hospitals that treat accident victims to keep their

17

emergency rooms open when often those victims are uninsured. (See, e.g, Assem. Com. on Judiciary, Analysis of Assem. Bill 2733 as amended May 6, 1992, p. 2; Sen. Ins., Claims & Corps. Com., Analysis of Assem. Bill 2733 as amended Jul. 1, 1992, pp. 1-2.) The history suggests the 72-hour limit was removed because some patients treated in hospital emergency rooms remain in the hospital "for longer than 72 hours" and require "routine care after the initial emergency care is given." (See, e.g, Assem. Com. on Judiciary, Analysis of Assem. Bill 2733 as amended May 6, 1992, p. 2; Sen. Ins., Claims & Corps. Com., Analysis of Assem. Bill 2733 as amended Jul. 1, 1992, p. 2.) Thus, the Legislature contemplated the amendments would cover nonemergency services that flow from the provision of emergency services when patients remain in the hospital.

*Parnell*, *supra*, 35 Cal.4th at page 604—which the trial court cited for the proposition that after the 1992 amendments, "the hospital could now recover for all 'treatment, care, and maintenance of the [patient] . . . resulting from [the] accident or negligent or other wrongful act' "—does not dictate otherwise. The issue in *Parnell* was whether a hospital could assert a lien under the HLA to recover the difference between its usual and customary charges and the amount received from a patient and its insurer when the hospital had agreed to accept the amount the patient and insurer paid as "payment in full" for its services. (*Id.* at p. 598.) Our Supreme Court concluded the hospital could not. (*Ibid.*) After explaining that, as enacted in 1961, the HLA contemplated a debt owed by the patient to the hospital, the Court stated, "[t]he subsequent revisions to the HLA in 1992 do not compel a different conclusion. In response to the difficulties encountered by hospitals in 'keeping their emergency rooms open,' the Legislature expanded the HLA to permit hospitals to recover compensation for more than just the first 72 hours of emergency care. (Assem. Com. on Judiciary, conc. in Sen. Amends. to Assem. Bill No. 2733 (1991–1992 Reg. Sess.) as amended June 25, 1992, p. 2.) Under the revised (and current) version, the hospital could now recover for all 'treatment, care, and maintenance of the [patient] . . . resulting from [the] accident or negligent or other wrongful act.'

18

(§ 3045.1.) In making these revisions, however, the Legislature was again concerned with 'accident victims' who are 'uninsured' and who do not pay their debt to the hospital. (Assem. Com. on Judiciary, conc. in Sen. Amends. to Assem. Bill No. 2733 (1991–1992 Reg. Sess.) as amended June 25, 1992, p. 2.) Thus, by expanding the HLA, the Legislature merely sought to enhance the ability of hospitals to collect on this debt. It did not intend to alter the underlying basis for the lien—i.e., the debt owed by the patient to the hospital for its medical services." (*Parnell,* at p. 604.)

In this context, the language from *Parnell* that the trial court quoted does not tell courts to ignore the statute's plain language requirement that emergency services be provided before hospitals can recover for other services. *Parnell* acknowledges that the central concern addressed by the amendments was the ability for emergency rooms to remain open, and that part of the way the Legislature remedied the issue was by allowing a hospital to collect on all the debt a patient incurred when it went to a hospital for emergency and follow-up care and not just the debt for the first 72 hours of care.

### d. Meaning of Emergency Services

The HLA does not explicitly define "emergency . . . medical or other services." (§§ 3045.1-3045.6.) The use of the term is "emergency . . . services" is ambiguous. The term could refer to services provided by a hospital when a person arrives at the hospital's emergency department and seeks care. It could refer to any services a hospital provides when a patient needs immediate care even outside the emergency room. Given the Legislature's focus on keeping emergency rooms operational when it adopted Assembly Bill 2377, the Legislature was more concerned with addressing the former.

With this in mind, we find the definition of emergency services contained in article 7, of chapter 2, of division 2 of the Health and Safety Code (article 7) in 1992 to be illuminating. Article 7 contains Health and Safety Code section 1317, which was enacted in 1973, and requires licensed health facilities that operate emergency

19

departments to provide "[e]mergency services and care" to "any person requesting the services or care . . . for any condition in which the person is in danger of loss of life, or serious injury or illness . . . when the health facility has appropriate facilities and qualified personnel available to provide the services or care." (See Health & Saf. Code, § 1317 (2024 and 1992).) In 1987, the Legislature amended Health and Safety Code section 1317 to prohibit emergency departments from refusing potential patients "based upon, or affected by, the person's . . . insurance status, economic status, or ability to pay for medical services." (Stats. 1987, ch. 1225, § 1.)

When the Legislature amended Health and Safety Code section 1317 in 1987, it adopted definitions in Health and Safety Code section 1317.1 that control article 7. Notably, in 1992 section 1317.1 defined, " '[e]mergency services and care' " as "medical screening, examination, and evaluation by [specified medical personnel], to determine if an emergency medical condition or active labor exists and, if it does, the care, treatment, and surgery by [specified medical personnel] necessary to relieve or eliminate the emergency medical condition, within the capability of the facility." (Health & Saf. Code, § 1317.1, subd. (a) (1992).) It defined " '[e]mergency medical condition' " as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in any of the following: [¶] (1) Placing the patient's health in serious jeopardy. [¶] (2) Serious impairment to bodily functions. [¶] (3) Serious dysfunction of any bodily organ or part." (Health & Saf. Code, § 1317.1, subd. (b) (1992).) These definitions remain substantively the same today. (Health & Saf. Code, § 1317.1, subds. (a)(1) & (b).) We may assume that, when the Legislature amended section 3045.1, it was aware of how "emergency services" was defined in statutes that require hospitals to provide emergency services to uninsured patients. (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 199 [courts must assume that when enacting a statute the Legislature was aware of existing related laws and intended to maintain a consistent body

20

of rules].)  This seems particularly likely given the Legislature's concerns regarding the fiscal impacts to emergency rooms from treating uninsured patients.

Under this meaning of "emergency . . . services,"  plaintiff received emergency services due to the injuries he sustained in the accident.  Plaintiff went to the emergency room on July 7, 2015.  He went because he was in so much pain that he could barely walk and he could not feel his foot.  Dr. Julie evaluated plaintiff to ensure plaintiff did not have a medical condition that placed plaintiff's health in jeopardy if not immediately treated.  The fact that plaintiff's emergency room visit was a few weeks after the accident does not change the fact that plaintiff obtained emergency services for injuries he sustained in the accident.

Defendants argue that emergency services are services provided when a person has a need for immediate medical attention and suggest that to qualify as "emergency services" the services must be provided immediately after an accident.  We disagree.  Though a degree of immediacy is consistent with the common understanding of the word "emergency," we believe any immediacy should be measured by the level of need when the treatment is sought and not on either (1) how soon after the injury-causing event treatment is sought, or (2) the level of an injured person's need for services at the level of need at the time of treatment.  (See Webster's 3d New Internat. Dict. (1986) p. 741; Webster's 3d New Internat. Dict. (1993) p. 741  [both defining the word emergency to include "an unforeseen combination of circumstances or the resulting state that calls for immediate action . . . as a : a pressing need . . . b : a sudden bodily alteration such as is likely to require immediate medical attention (as a ruptured appendix or surgical shock)"].)

e.  Ongoing Medical Services

We next consider the extent to which a hospital can assert a lien under the HLA for the services it (or its affiliate) provides a patient "ongoing" from when the hospital

21

provides emergency services. We conclude the HLA only applies to services obtained while the patient remains in the emergency room, hospital, or an associated care facility as needed to relieve or eliminate the emergency medical condition—i.e., the acute status that brought the patient to the emergency room—within the capability of the facility. That is, it applies to services received before the patient is discharged to go home. The HLA does not apply so broadly as to also include services UC Davis provided plaintiff after the emergency room staff discharged him. To the extent *Newton v. Clemmons* (2003) 110 Cal.App.4th 1, 10-13 (*Newton*), suggests otherwise, we disagree.

According to *Newton*, in 1991 Webster's Ninth New Collegiate Dictionary (9th ed. 1991) on page 825 defined "ongoing" as, " '1: being actually in process,' or '2: continuously moving forward: GROWING.' " (*Newton*, *supra*, 110 Cal.App.4th at p. 12.)

This understanding of the word "ongoing" does help make plain that, to the extent hospitals can collect under the HLA, the ongoing services must be "continuously moving *forward*" from emergency services. However, the definition is not helpful in ascertaining the breadth of future services for which a hospital that provides "emergency . . . services" can secure remuneration under the HLA. (§ 3045.1.) That is, the extent future services provided by the hospital are considered "ongoing" to the emergency services remains ambiguous.

A variety of factors convince us that the term "ongoing" is limited to services a hospital (or affiliated facility) provides a patient while the patient remains undischarged from the hospital (or affiliated facility) following admission through an emergency room. It does not include *all* future services the patient may receive from the hospital related to the underlying injury that led to the emergency treatment.

We consider the context in which the term appears. (See *Phelps v. Stostad* (1997) 16 Cal.4th 23, 32.) The statute contemplates collection for services by a hospital and affiliated health facilities "as defined in Section 1250 of the Health and Safety Code."

22

(§ 3045.1.) Under Health and Safety Code section 1250, " 'health facility' means a facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation and including care during and after pregnancy, or for any one or more of these purposes, for one or more persons, *to which the persons are admitted for a 24-hour stay or longer*." (Italics added; see also Health & Saf. Code, § 1250 (1992).) The list of "health facilities" identified includes general acute care hospitals, intermediate care facilities, skilled nursing facilities, and nursing facilities. (Health & Saf. Code, § 1250, subds. (a), (d), (k); see also Health & Saf. Code, § 1250, subds. (a), (d), (k)(1) (1992).) The use of this definition for health facilities strongly suggests that the contemplated "ongoing" services provided are those a hospital provides when a patient may no longer be in a condition necessitating "emergency services," but remains in the hospital or an affiliated nursing facility to recuperate before being discharged.

Similarly, we note that the lien applies to an amount that covers the charges of the hospital or affiliated facility, "in which services are provided for the treatment, care, and maintenance of the person *in the hospital or health facility* affiliated with the hospital . . . ." (§ 3045.1, italics added.) This language suggests the lien is meant to cover inpatient care a patient receives following admission through the emergency room.

As noted above, the Legislative history also reflects the Legislature's central concern in amending section 3045.1 was to ensure hospital emergency rooms can secure payment when they treat uninsured patients injured by others, patients' hospitals cannot turn away for want of insurance. Though the Legislature expanded the scope of covered services by dropping the 72-hour requirement and allowing for services that were "ongoing" to the emergency services, it did so with the understanding that, "[s]eriously injured persons *are in the hospital* for longer than 72 hours and often require routine care

23

after the initial emergency care is given." (See, e.g, Assem. Com. on Judiciary, Analysis of Assem. Bill 2733 as amended May 6, 1992, p. 2, italics added.)

Furthermore, when it considered the language that allows hospitals to collect for services provided by affiliated "health facilities," one committee report stated the language would allow "nursing facilities associated with hospitals to also file liens for services rendered." (See report regarding Assem Bill 2733, prepared for the Sen. Ins., Claims, & Corps. Com. Jul. 1, 1992.) That is, the Legislature contemplated that the new language would allow a hospital to use the HLA to cover 24-hour care an affiliated entity gives a patient recuperating once the emergency has abated but the patient remains too weak or unwell for discharge. The history does not reflect a Legislative intention that every service offered by a hospital and its affiliates in perpetuity be reimbursed under the HLA so long as at some point the hospital provides emergency services for a condition caused by the injury. As a practical matter, given the commonness of initial emergency room visits following accidents, to so hold would eviscerate our Supreme Court's holding in *Howell* whenever a person needing health care was attended to in an emergency room following an injury-causing accident.

Based on all of the above, the emergency and ongoing services plaintiff received for which UC Davis could assert a lien under the HLA are the services plaintiff received on July 7, 2015, until he was discharged from the emergency room to go home. The remaining services UC Davis provided were not "ongoing" to the emergency services as contemplated by the HLA. Plaintiff's damages for the remaining services must be determined under *Howell*.

### C. Reversible Error

An evidentiary error is "reversible if it resulted in a miscarriage of justice." (*Nevarrez v. San Marino Skilled Nursing & Wellness Centre, LLC* (2013) 221 Cal.App.4th 102, 117.) "A miscarriage of justice occurs if, based on the entire

24

record, including the evidence, it is reasonably probable the jury would have reached a result more favorable to appellants absent the error.  [Citation.]  ' " '[P]robability' in this context does not mean more likely than not, but merely a  reasonable chance, more than an abstract possibility." [Citation.]' "  (*Id.* at p. 123, italics omitted.)

Evidence that the "reasonable value" of services plaintiff received—other than when he was in the emergency room—was more than he and his insurer paid for them pursuant to negotiated rates should not have been admitted in the trial of this matter. (*Corenbaum*, *supra*, 215 Cal.App.4th at p. 1329.)  While it "is theoretically possible" that the "reasonable value" as calculated by Hyland was "lower than the rate negotiated" with plaintiff's insurer, this seems extremely unlikely.  (See *Bermudez*, *supra*, 237 Cal.App.4th at p. 1330.)  There is a reasonable probability that the jury entered an award higher than the liability plaintiff incurred as measured by *Howell*.  Indeed, the jury awarded the top figure Hyland projected for all services.

The award for past medical damages must be vacated.

### III

### *Future Medical Damages*

Defendants argue a lack of substantial evidence supports the future medical damages award.  Defendants also argue the amount of future medical damages must be reversed under *Howell*, *supra*, 52 Cal.4th 541 due to errors related to the proper measure of future medical damages.  We find the total amount awarded as damages for future medical expenses is not supported by substantial evidence.

A.  Additional Background

Dr. Copenhaver testified that stimulators were a part of a portfolio of options that might provide plaintiff some relief, and plaintiff and his care team were exploring the possible use of a dorsal root ganglion (DRG) stimulator.  Before implanting a permanent DRG stimulator, doctors will conduct a trial wherein doctors place electrodes over the

25

patient's nerve root and connect wires to an external device to test if a more permanent device could be successful or not. Dr. Copenhaver testified this device has had "very good success" with patients. He agreed the hope was the stimulator would improve plaintiff's quality of life.

Dr. Copenhaver testified that roughly six months before the jury trial, doctors attempted to place electrodes over plaintiff's impacted nerve root through a needle, but the attempt failed due to scar tissue in plaintiff's back. As a result, doctors would need to explore a "secondary option" for electrode placement and have a surgeon make an incision and visually guide the electrode, and the surgery was not yet scheduled. When asked if he could predict what kind of success the stimulator might have, Dr. Copenhaver responded, "[i]t's unclear, because the first predictive success that he had" with the spinal cord stimulator, "was at one particular stage in his trajectory . . . , but there's been several surgeries since then, potential injury to the nerve root that's further, and it's unclear. [¶] But the attempt that we do is typically a trial," you place the electrodes and run the trial, "and determine if it's going to be successful or not." He testified that he still saw a stimulator as "an opportunity for treatment to help pain" and agreed pursuing one was a reasonable course of treatment.

The next day, Dr. Mimran testified. On direct, plaintiff's counsel asked him to assume that Dr. Copenhaver "talked about that he needs one of those dorsal root ganglion – the peripheral nerve stimulators. And it hasn't been scheduled, but he needs it. Okay? [¶] Do you agree, in your professional opinion, that he needs that and that could provide some help for him?" Dr. Mimran responded, "[y]es, sir."

On cross examination, Dr. Mimran was less emphatic. When asked if he would defer to the doctors at UC Davis regarding the appropriate next steps for the stimulator, Dr. Mimran said, "[y]es." He said, plaintiff's "need for the peripheral nerve stimulator will be based on the placement of a trial and whether that's successful. And that trial hasn't happened yet. And so it's hard to determine whether a permanent one will be

26

needed.  If the trial doesn't help him, they won't implant a permanent peripheral nerve stimulator. . . .  [T]he need for it is based on the trial. . . .  [W]e can't decide whether he needs it until the trial happens."  Defense counsel asked, "[s]o at this point we're speculating about what, if anything, else he may or may not need until that trial . . . is completed.  True?"  Dr. Mimran responded, "[c]orrect."

Hyland testified regarding the cost of future medical services plaintiff might receive.  Hyland identified possible services after speaking with Dr. Mimran, reading his deposition, and reviewing a report he prepared.  One category she priced was the DRG stimulator and various costs associated with its maintenance and implantation.

Enos then calculated a present value of $749,986 for all the future services Hyland listed, $339,674 of that total was for the DRG stimulator and associated maintenance costs.

The jury awarded plaintiff $685,993, for future medical expenses which is $63,993 less than Enos's total.

## B.  Proving Future Medical Costs

An injured party may collect damages for detriment "certain to result in the future."  (§ 3283.)  California decisional law has noted that, "the 'requirement of certainty . . . cannot be strictly applied where prospective damages are sought, because probabilities are really the basis for the award.'  (6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1552, p. 1027.)  Still, ' " 'there must be evidence to show such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury.' [Citations.]" ' (*Bellman v. San Francisco H. S. Dist.* (1938) 11 Cal.2d 576, 588 [].)"  (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 533.)  With respect to future medical damages, an injured plaintiff "is entitled to recover the reasonable value of medical services that are reasonably certain to be necessary in the future."  (*Cuevas v. Contra Costa County* (2017) 11 Cal.App.5th 163, 182; see also

27

*Bermudez*, *supra*, 237 Cal.App.4th at p. 1326 [stating a jury instruction according to this principle was correct].)

C. Analysis

" 'Substantial evidence is evidence that is "of ponderable legal significance," "reasonable in nature, credible, and of solid value," and " 'substantial' proof of the essentials [that] the law requires in a particular case." ' (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006 [].)" (*LaMarr v. Regents of University of California* (2024) 101 Cal.App.5th 671, 675-676.) "Although it is true that the testimony of a single witness, including the testimony of an expert, may be sufficient to constitute substantial evidence [citation], when an expert bases his or her conclusion on factors that are 'speculative, remote or conjectural,' . . . the expert's opinion 'cannot rise to the dignity of substantial evidence' and a judgment based solely on that opinion 'must be reversed for lack of substantial evidence.' [Citations.]" (*Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1191-1192.)

Here, Dr. Copenhaver testified that to determine if a DRG stimulator would be successful for plaintiff, a trial needed to be conducted and that medical trial had not been performed before the trial. When asked if plaintiff's past luck with a spinal cord stimulator might be indicative of success with the DRG stimulator, he admitted possible success remained, "unclear" given the trajectory of plaintiff's condition.

Likewise, Dr. Mimran ultimately conceded it was hard to determine if a permanent DRG stimulator would be needed without first completing the trial, and, without the trial, doctors were speculating as to whether the stimulator treatment would reduce or eliminate plaintiff's pain.

In short, neither Dr. Copenhaver's nor Dr. Mimran's testimony established there was a reasonable certainty plaintiff would need a permanent DRG stimulator. Though "reasonable certainty" may not require "absolute certainty" (*Sargon Enterprises, Inc. v.*

28

*University of Southern California* (2012) 55 Cal.4th 747, 775), this testimony established no meaningful degree of certainty that a permanent stimulator eventually would be used or useful. The evidence established only that a trial to determine whether plaintiff was a likely candidate for the treatment was in the future anticipated.

Given that the implant of the DRG stimulator and its maintenance costs accounted for over $300,000 of the $749,986 of present value damages Enos calculated for future medical expenses, the evidence presented was not sufficient to support an award of $685,993 nor does the record reflect how the jury arrived at that award for future medical expenses.

Plaintiff has argued that we should deem defendants' arguments regarding the sufficiency of evidence to support medical damages forfeited due to defendants' failure to sufficiently summarize favorable evidence in support of the verdict in their opening brief. While it may be that defendants' summary is lacking with respect to some other individual items that comprised the future damages award, defendants' summary regarding testimony about the stimulator is sufficient.

D. Proceedings on Remand

We have concluded the total award for future medical expenses is not supported by substantial evidence. However, this does not mean we have concluded none of the award is supported by substantial evidence. Indeed, our review of those parts of the record defendants failed to adequately summarize in their brief suggests that another factor that contributed to the future medical damages award—a likely future fusion surgery—was shown with reasonable certainty to be necessary due to plaintiff's accident injuries.

Because the verdict form does not itemize the jury's award for future medical expenses by service, we cannot ascertain (1) the extent to which the jury's total award included costs for the DRG stimulator and its maintenance, or (2) the amount of services

29

the jury concluded defendant will need in other categories of services based on the assumption a DRG stimulator would be successfully implanted.

Accordingly, we reverse the jury's award of damages for future medical costs and remand for a new trial on this issue. (See *Atkins v. City of Los Angeles* (2017) 8 Cal.App.5th 696, 742-743 (*Atkins*).)

IV

*Lost Earnings*

Defendants argue the damages award for plaintiff's past and future earnings are not supported by substantial evidence. With respect to both categories, defendants argue this is so because none of the records Enos used to determine plaintiff's salary were entered into evidence, no one ever testified as to how much income plaintiff made while he was employed, and Enos used information regarding salary taken from the unadmitted documents to calculate plaintiff's lost earnings.

Defendants also argue substantial evidence does not support (1) that plaintiff would not be able to work in the future; or (2) that, but for the injury, plaintiff would have remained employed with the FTB until age 60.

We disagree with both arguments.

A. Additional Background

1. Motion in Limine

Defendants brought a single motion in limine to prevent plaintiff's expert witnesses, including Enos, from providing any opinions at trial based on their review and reliance of case specific facts contained in medical records, medical billing records, and employment records of plaintiff under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). They also sought to prevent experts from referencing hearsay statements

30

contained in those records without satisfying the proper foundation. The trial court denied the motion without prejudice to raising the issue during trial.

### 2. Early *Sanchez* Objections Regarding Medical Records

At trial, defense counsel began making *Sanchez* objections early and often. For example, plaintiff called a radiologist to review some of plaintiff's medical records and medical imaging. During this testimony, the defense repeatedly interjected objections based on *Sanchez*, or for a lack of proper foundation, and/or arguing the questions called for speculation. During a break, the court said to defense counsel, "[w]ith respect to the *Sanchez* objections . . . you're technically correct, but I guess what I'm assuming is at some point, either through the plaintiff or other testimony, we'll get testimony about [plaintiff's] symptoms." Defendants' counsel continued to make *Sanchez* objections.

On the third day of testimony, the court used another break to discuss these objections with counsel. The court told defense counsel, "you do not need to raise your *Sanchez* objection continuously [*sic*]. You can raise it at the end and say, I move to strike this expert's testimony because there's a *Sanchez* issue." Plaintiff's counsel then moved to introduce all the UC Davis medical records into evidence based on the business record exception to the hearsay rule. Defendants' counsel objected and the court took issue with this objection, saying, "[w]hen he says, I reviewed all the records to base my opinion and you object on *Sanchez*" on the grounds it is "case-specific hearsay . . . the answer is to move all those records in. You can't have it both ways."

### 3. Colloquy Regarding Medical Bills Before Hyland and Enos Testified

The day before Hyland and Enos testified, counsel and the court had a discussion regarding the admission of medical bills. Plaintiff's counsel said given the "*Sanchez* issue" counsel wanted to "potentially move into evidence some of the medical bills . . . ." Defendants' counsel protested. The court told defendants' counsel he could not make a *Sanchez* objection and then object to admissible hearsay records coming in. The court

31

said there was a business records declaration for the bills, placing them within an exception to the hearsay rule. The court stated once the bills came in that way an expert could testify about them. Much of the discussion regarding the admissibility of the bills was about defendants' issues with bills being admitted to prove up the reasonable value of plaintiff's past medical services.

Following further discussion regarding admitting the bills, the court told defendants' counsel, "I am prepared to keep the bills out. . . . But if you're going to raise a *Sanchez* objection, then I don't see how you can have it both ways, and I think the bills come in." The discussion ended as follows:

"[Defendants' counsel]: Let me do this. I'll object to the bills coming in. If I have to pick one, that's the one I'm going to pick.

"THE COURT: Okay. Then fine, the bills will not come in.

"[Plaintiff's counsel]: Okay.

"THE COURT: Perfect.

"[Plaintiff's counsel]: No problem.

"THE COURT: Okay. Great. Anything else?

"[Plaintiff's counsel]: No *Sanchez* objection then.

"THE COURT: Right.

"[Plaintiff's counsel]: Okay. So I don't intend to offer the bills."

### 4. Testimony Regarding Ability to Work and Future Plans

Plaintiff was 42 during trial. Plaintiff testified he began working at the FTB in an intermittent position in 2012, and he applied for and received a permanent position while in training. He took the job because it offered more stability, better medical benefits, and more predictable hours than his prior occupation. Between 2017 and 2019, when the spinal cord stimulator was providing him some relief, he received a couple of promotions. He testified it was his intention to retire at 60.

Hyland testified regarding the chance that plaintiff would work again. In forming an opinion regarding the likelihood of Yaffee working again and his future wage loss, Hyland looked at W-2s, payroll documents, work release documents, personnel documents regarding wage increases and separations, CalPERS retirement documents, medical records, a physician's report on disability prepared by Dr. Lao and Dr. Copenhaver, and those doctors' depositions. This review confirmed to her that Dr. Lao and Dr. Copenhaver had placed Yaffee on full medical disability beginning in May 2021.

Hyland testified that the U.S. Department of labor has various categories of work ranging from light to very heavy, and the State of California adds semisedentary within its workers' compensation system. With light work, one is not supposed to lift more than 20 pounds occasionally or more than 10 pounds frequently, but one could be on their feet all day. With semisedentary work, one has the same lifting requirements, but it is not anticipated they'll be on their feet more than four out of eight hours a day. The weight an employee is expected to lift goes up as they get into the medium, then higher categories.

Hyland classified Yaffee's work as semisedentary and possibly completely sedentary, with no arduous physical requirements. She determined that if his doctors disabled him from work based not on physical issues, but because the impact of medications on his cognitive and mental functioning, there was not going to be work that would be more forgiving in the U.S. economy. She stated that Yaffee's physicians have disabled him from the lightest work in the economy, and "given that and their view that his limitations are permanent, it's not likely, from a vocational perspective, that he's going to be able to return to the labor force."

Hyland said the State of California is good at accommodations. She stated that CalPERS will grant a disability retirement when it determines that even with accommodations an individual is not going to be able to perform the essential functions

of a job. She believed CalPERS's approval of Yaffee's doctors putting him on full disability indicated he would not be able to return to the work force.

Prior to Dr. Mimran's testimony, Dr. Copenhaver testified regarding the results of an EMG examination of plaintiff in 2019 and 2021. Dr. Mimran was asked to assume the substance of Dr. Copenhaver's testimony, and Dr. Mimran stated those results confirm there is a nerve injury and that it's likely permanent.

Dr. Copenhaver testified he had reported on disability paperwork that plaintiff's incapacity would be permanent. He said that was not a decision he made lightly. He stated he made this decision on the basis that plaintiff was exhibiting "a perpetual cycle of even worsened concern" and "the nerve injury doesn't seem to be improving at all." He said that to the extent gains might be made in plaintiff's condition in the future, they would be "modest," and maybe around 10 or 15 percent.

### 5. Testimony Regarding Earnings and Benefit Values

Enos testified that to determine lost earnings, he adds up what a plaintiff would have earned over their work life expectancy if not injured, and he subtracts replacement earnings.

Enos noted plaintiff was a participant in the CalPERS retirement system. So, Enos also evaluated the difference in the retirement benefit plaintiff would have expected had he continued working and compared that to the reduced benefit plaintiff would receive by taking an early retirement.

Enos testified that to determine the present value of plaintiff's past income losses, he just needed to add together what plaintiff lost when he missed work, looking at what plaintiff would have earned and how much time he missed.

Enos testified that to determine past wage loss amounts, he reviewed W-2s, monthly paystubs, absence reports, personnel action forms, and earnings records. The

personnel action forms showed each time plaintiff received a raise or other changes in the rate of his pay, which helped Enos determine plaintiff's salary during absences.

Enos identified the approximate date ranges he used to calculate plaintiff's past wage loss when plaintiff missed work due to his injuries. These periods were consistent with testimony by plaintiff, his wife, and plaintiff's doctors.

For future lost earnings, Enos testified he needed to decide on a lump sum that if paid today would compensate plaintiff for his future losses. To do this, he considers inflation, increases in earnings, and the fact that money received now can be invested. Enos testified he looked at personnel action forms to determine what plaintiff's earnings were when he last worked and identified plaintiff's monthly pay. He said he multiplied that number by 12 to get an annual salary. He assumed plaintiff would continue working until he was 60. He included an offset for the early retirement benefit. He also considered lost retirement benefits based on plaintiff's early retirement.

Enos determined plaintiff's net past lost earnings discounted for benefits received as early retirement was $194,515. The jury awarded plaintiff that amount for past lost earnings.

Enos calculated plaintiff's future lost earnings as $1,243,347 and the future lost benefits as $109,843, for a total of $1,353,190 when discounted to today's dollars. The jury awarded plaintiff half that amount.

Defendants made no objections during Enos's testimony regarding lost earnings and did not move to strike Enos's testimony based on *Sanchez*.

B. Sufficiency of the Evidence of the Dollar Amount of Past Lost Earnings

Once it has been established that a defendant's conduct has caused a plaintiff an injury, "the focus of an award of damages is the quantification of detriment suffered by a party." (*Meister v. Mensinger* (2014) 230 Cal.App.4th 381, 396.) In a personal injury action, "[t]he measure of damages . . . is the amount which will compensate for all the

35

detriment proximately caused thereby." (§ 3333.) A plaintiff may seek the " 'loss of wages between the occurrence of the injury and the trial.' " (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 892.) "The rule is established that the plaintiff has the burden of proving, with reasonable certainty, the damages actually sustained by him as a result of the defendant's wrongful act, and the extent of such damages must be proved as a fact." (*Chaparkas v. Webb* (1960) 178 Cal.App.2d 257, 259; accord *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 83; see also *Nelson v. Black* (1954) 43 Cal.2d 612, 614.)

An expert witness may offer an opinion that is, "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] . . . [b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (Evid. Code, § 801.)

On direct examination, the expert, "may state . . . the reasons for his opinion and the matter (including, in the case of an expert, his special knowledge, skill, experience, training, and education) upon which it is based, unless he is precluded by law from using such reasons or matter as a basis for his opinion." (Evid. Code, § 802.)

On cross-examination, counsel may examine an expert regarding, "the matter upon which his or her opinion is based and the reasons for his or her opinion." (Evid. Code, § 721, subd. (a).)

Under *Sanchez, supra,* 63 Cal.4th at page 686, "[w]hat an expert cannot do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (See also *In re Marriage of Lietz* (2024) 99 Cal.App.5th 664, 673 [applying the *Sanchez*

36

findings re state evidentiary rules to civil actions].)  Despite the limit *Sanchez* placed on using experts to testify to the truth of hearsay statements it remains true that, "it is not improper under *Sanchez* for an expert to consider and rely on case-specific hearsay in forming his or her opinions.  (*Sanchez*, *supra*, 63 Cal.4th at p. 685.)  'The limitations that *Sanchez* placed on expert testimony concern case-specific information that an expert relates to a jury, not materials upon which the expert relies.'  (*People v. Camacho* (2022) 14 Cal.5th 77, 128.)"  (*People v. Curiel* (2023) 15 Cal.5th 433, 458.)

Here, defendants argue that Enos's testimony regarding past and future lost earnings was conclusory, and, therefore, not sufficient to support the dollar amount of the jury's awards for past and future lost earnings.  They reason Enos's testimony was conclusory because the documents upon which he relied were never entered into evidence, and no one ever testified regarding how much plaintiff earned before or after the accident.  They reason without these numbers and documents, the record lacks evidence of facts to support Enos's conclusions as to lost earnings.

An expert's opinion is conclusory when it is "unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion . . . ."  (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.)  Enos's opinion was accompanied by a reasoned explanation connecting the factual predicates upon which he relied to his ultimate conclusions.  He listed the types of documents from which he gathered his factual predicates, he explained the variables that contributed to his calculations, and he explained steps he took to verify the accuracy of the information contained in the records.  Nothing in the record before us suggests Enos based his calculations on unreasonable assumptions, or on speculative or conjectural data.  (See *Atkins, supra,* 8 Cal.App.5th at p. 740.)  Nothing in the record suggests the records upon which Enos relied were not the type of records "reasonably . . . relied upon by an expert in forming an opinion upon the subject" of lost earnings.  (Evid. Code, § 801, subd. (b).)

37

Enos was allowed to testify about his conclusions based on these records. (See *Zuniga v. Alexandria Care Center LLC* (2021) 67 Cal.App.5th 871, 887-889 [trial court committed prejudicial error in excluding an expert's testimony based on inadmissibility of the spreadsheets the expert relied upon, though the court acted within its discretion to exclude the spreadsheets; the spreadsheets were compiled using admissible data, and there was nothing speculative or conjectural about them, and the expert had testified about relying on similar spreadsheets before].) When defendants failed to move to strike Enos's testimony on the basis that plaintiff used it to get in the truth of hearsay information—e.g., that personnel records supported plaintiff lost $194,515 worth of income during his pretrial absences—they forfeited their ability to now argue that plaintiff could not rely on their experts to convey the accuracy of the personnel records and the conclusions they support. (See *People v. Espinoza* (2018) 23 Cal.App.5th 317, 320 [*Sanchez* objection forfeited by failure to properly make a *Sanchez* objection]; see also Evid. Code, § 353 ["A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] . . . [¶] [t]here appears of record an objection to or a motion to exclude or to strike the evidence *that was timely made* and so stated as to make clear the specific ground of the objection or motion"].)

Enos's testimony was sufficient evidence to support the dollar amount of plaintiff's lost past earnings.

### C. Sufficiency of Future Lost Earnings

Defendants' arguments with respect to lost future earnings based on the fact that the records Enos relied on did not come into evidence, fail for the same reason those arguments fail regarding past earnings: nothing in the record suggests it was not reasonable for Enos to rely on the records he testified to, he provided a thorough explanation as to how he used the information in those records to reach his conclusion,

38

and to the extent defendants now take issue with his stating as fact that numbers support a specific total, the proper way to address that issue was with a motion to strike the relevant testimony. It was not proper to raise the issue after the jury had made its decision relying on a properly developed expert opinion.

We also find unavailing defendants' argument that the permanent nature of plaintiff's disability and the likeliness plaintiff would have remained employed with the FTB until 60 were too speculative to support the award.

First, we observe the jury only awarded plaintiff half of the amount Enos estimated plaintiff would lose in future earnings because of his injuries. Thus, we cannot say that the jury concluded plaintiff (1) would, in fact, *never* return to work; and (2) but for the injury would have retired from the FTB.

Second, the testimony of Hyland, Dr. Mimran, and plaintiff's doctors amounts to sufficient evidence to support a finding that it is reasonably certain plaintiff will remain out of work for a significant amount of time, if not for the rest of his life. Notably, Dr. Copenhaver, one of his treating physicians, testified that any gains in plaintiff's future condition would be modest. And Hyland explained why, given the nature of his disabilities, it is unlikely plaintiff could perform any job in the future and that he has been disabled from the lightest work in the economy.

Third, sufficient evidence supported a finding that plaintiff would have remained with the FTB until he was 60 but for his disability. Plaintiff had worked with the FTB, except when he took time off due to his injuries, for approximately nine years by the time he went on disability in his early forties. During that time he advanced within the department. His reasons for choosing to seek employment with the FTB—stability, predictable hours, and benefits—were practical and typical of someone with a family looking for a permanent place to land in their career. He testified he had hoped to retire at age 60.

The cases defendants cite to support their argument that an assumption that plaintiff would retire from the FTB at 60 do not support their argument and are inapposite.

In *Atkins, supra,* 8 Cal.App.5th at pages 737 and 743, a court of appeal reversed an award of future lost earnings on the basis that the expert's opinion was based on the speculative assumption that plaintiffs would have remained employed through retirement. In *Atkins*, the plaintiffs were potential police academy trainees, and the expert had assumed they would graduate, complete probation, and remain with the department an extra five years past their initial retirement date and qualify for extra retirement. (*Id.* at p. 737.)

Here, the plaintiff had an established work record with the FTB and he made a conservative estimate regarding his retirement date.

In *Toscano v. Greene Music* (2004) 124 Cal.App.4th 685, 689, 695-696, the expert assumed that the plaintiff would have remained with his prior employer as the manager of a piano store or taken a job at a comparable salary but for being induced to resign with promises of other employment. The court of appeal concluded the evidence had not established the plaintiff had a definite expectation of continued employment at the time plaintiff resigned. (*Id.* at p. 696.) In reaching this conclusion, the court focused on the at-will nature of the plaintiff's prior employment and the lack of any evidence regarding the terms of the plaintiff's prior employment. (*Id.* at pp. 696-697.) The expert had admitted that the plaintiff's prior employer could have fired him for any reason. (*Ibid.*) Here, no evidence came forth that suggested plaintiff's employment was at will or uncertain, and, in contrast, evidence suggested plaintiff was advancing in the department.

The evidence was sufficient to support the jury's finding that, because of his injuries, plaintiff was reasonably certain to be unable to work for a significant amount of time in the future and that this loss of work would impact his retirement income.

40

## V

### *Future Non-Economic Damages*

Defendants argue the jury's award of $568,290 for future noneconomic damages must be reversed because it is based on "speculative assumptions" regarding how much pain and suffering plaintiff will suffer over the next estimated 37 years of his life. To support this contention, they ignore large swaths of the testimony at trial, and focus on a portion of the transcript where Dr. Loa admitted during cross examination that she had once said she could not offer an opinion on plaintiff's future care needs because she is not a fortune teller. Defendants also point to where, when speaking about plaintiff's future medication needs, Dr. Mimran admitted that who exactly would determine plaintiff's future medication needs would depend "on how things progress," and "if he has future problems," where "other treatment team members may take over the medication decision making."

" ' "Non-economic" damages are such "subjective, non-monetary losses [as] pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." ' [Citation.] 'To recover future damages, a plaintiff must prove that his or her detriment is reasonably certain to result in the future.' [Citation.]" (*Audish v. Macias* (2024) 102 Cal.App.5th 740, 752.) " 'While there is no clearly established definition of "reasonable certainty," evidence of future detriment has been held sufficient based on expert medical opinion which considered the plaintiff's particular circumstances and the expert's experience with similar cases.' [Citation.] However, expert testimony is not required in all cases. For example, it is unnecessary if the injury is such that the jury could conclude, based on all the evidence and relying upon its own experiences and common knowledge, that the future harm is reasonably certain to occur. . . . Courts have affirmed a jury's finding of future damages based on the plaintiff's testimony of

41

continued pain and suffering at the time of trial." (*Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 460.)

"The amount of damages to be awarded is a question of fact committed, first to the discretion of the trier of fact, and then to the discretion of the trial court on a motion for new trial." (*Fernandez v. Jimenez* (2019) 40 Cal.App.5th 482, 490.) We give great weight to the jury and trial court's determinations. (*Ibid.*) "The amount to be awarded is 'a matter on which there legitimately may be a wide difference of opinion.' " (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 508.) We will interfere if the verdict is so large that, "at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." (*Id.* at p. 507.)

At trial Dr. Lao testified that at a January 2022 visit with her, plaintiff reported his nerve pain was getting worse and he was suffering daily attacks. Dr. Copenhaver characterized plaintiff's condition as chronic. When counsel asked Dr. Mimran if, based on his examination of plaintiff and record review, he believed plaintiff has a severe and permanent nerve injury, Dr. Mimran said the injury is severe. He admitted it would be hard to make a conclusion as to permanence, but that given plaintiff had been suffering from the injury for seven years, "it's pretty close to permanence." Dr. Javidan saw the impacted nerve in May 2021, and said it did not look healthy "at all." Dr. Mimran and Dr. Javidan both said it was more likely than not that plaintiff will need another fusion surgery in his lifetime.

Plaintiff's wife said plaintiff has lost his sense of self-worth and feels "hopeless." She testified she and their son are afraid to touch plaintiff out of fear of hurting him. Plaintiff described daily bouts of electric pain that can go on for hours.

We do not know how far into the future the jury concluded plaintiff will suffer severe pain from his injuries, but sufficient evidence established that it is reasonably certain plaintiff will suffer some severe physical and emotional distress in the future, and

42

that he will likely need another fusion surgery.  On this record, the future noneconomic damages award is amply supported.

Defendants' citation to *Corenbaum*, *supra*, 215 CalApp.4th at page 1334, does not persuade us that the future noneconomic damages award should be reversed.  While there the court reversed a noneconomic damages award when it reversed other compensatory damages, the case does not stand for the proposition that reversal of noneconomic damages is required when other damages awards are reversed.

## VI

### *Costs and Prejudgment Interest*

A reversal of a judgment "necessarily compels the reversal of the award of . . . costs to plaintiffs based on the judgment because ' "[a]fter reversal of a judgment 'the matter of trial costs [is] set at large.' " ' (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1053 [].)" (*Bevis v. Terrace View Partners, LP* (2019) 33 Cal.App.5th 230, 263.)  Thus, an order awarding costs " 'falls with a reversal of the judgment on which it is based.' " (*Ibid.*)  Likewise, because here we vacate part of damages the trial court awarded, the award of prejudgment interest based on that award must also be reversed.  (See *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 492.)

### DISPOSITION

The awards for past and future medical expenses are reversed and remand the matter for a new trial limited to these issues.  The judgment is otherwise affirmed.  The

award for costs and prejudgment interest is also vacated.  Costs on appeal are awarded to defendants.  (Cal. Rules of Court, rule 8.278(a).)


                                         _____

                                         HULL, Acting P. J.


We concur:


_____

DUARTE, J.


_____

BOULWARE EURIE, J.

44